721 A.2d 718 (1998)
STATE of New Jersey, Plaintiff-Respondent,
v.
Barry WILLIAMS, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted October 1, 1998.
Decided October 19, 1998.
*720 Ivelisse Torres, Public Defender, for defendant-appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the brief).
Fred J. Theemling, Jr., Hudson County Prosecutor, for plaintiff-respondent (Robert F. Butler, Assistant Prosecutor, on the brief).
Before Judges BAIME and KIMMELMAN.
*719 The opinion of the court was delivered by BAIME, P.J.A.D.
A jury found defendant guilty of first degree robbery (N.J.S.A. 2C:15-1), second degree conspiracy to commit armed robbery (N.J.S.A. 2C:5-2), second degree possession of a firearm for an unlawful purpose (N.J.S.A. 2C:39-4a), and third degree possession of a handgun without a permit (N.J.S.A. 2C:39-5b). Finding that defendant had been convicted previously of a Graves Act offense, the trial court imposed a mandatory extended term of life imprisonment with a twenty-five year parole disqualifier on the conviction for first degree robbery. The trial court sentenced defendant to a term of ten years with a five year parole disqualifier on the conviction for second degree conspiracy, and to a term of five years with a three year parole disqualifier on the conviction for third degree possession of a handgun without a permit. All sentences are to run concurrently. The conviction for second degree possession of a firearm for an unlawful purpose was merged.
On appeal, defendant argues: (1) the trial court erred by denying his motion to suppress evidence, (2) plain error was committed by a police officer's allusion to defendant's "criminal jacket," (3) the prosecutor's comments in summation prejudiced defendant's right to a fair trial, and (4) the extended sentence was grossly disparate to the lenient term imposed on the codefendant. We find no merit in these contentions. However, we vacate defendant's conviction for second degree conspiracy and remand for resentencing on the conviction for third degree possession of a handgun without a permit.

I.
At the outset, we note that the evidence against defendant was overwhelming. Among other things, defendant's accomplice, Regina Wright, entered into a plea agreement and testified as a State's witness, the gun used in committing the robbery was found in defendant's possession upon his arrest, *721 and one of the two victims provided strong identification evidence. The trial record reeks of defendant's guilt.
According to the State's evidence, on January 22, 1995, defendant and Wright agreed to commit a robbery. The targeted victims were an elderly couple, John and Ann Hightower. After luring Mr. Hightower to the front door of his apartment, defendant produced a handgun and forced his way into the vestibule. At various times, defendant placed the barrel of the gun against Mr. Hightower's back and Mrs. Hightower's face, repeatedly demanding their money. Although Wright appeared somewhat sympathetic to the plight of the victims, she alternatively assisted defendant in ransacking the apartment and standing guard at the doorway. After relieving the Hightowers of their money and jewelry, defendant ripped the telephone cord out of the wall, and, along with Wright, fled from the scene.
The police were immediately summoned. As part of their investigation, members of the Bureau of Identification "lifted" twelve fingerprints from the crime scene. The fingerprints were then submitted to the State Police for analysis.
Several weeks later, members of the Jersey City Police Department arrested defendant and Wright in the course of an unrelated investigation. More specifically, the police received a telephone call from Scott Holloman in which he reported that a male and female were in a car in front of his house and that they were armed with a handgun. Upon responding to the scene, Police Officer Juan Torres immediately recognized Holloman as a lieutenant in the army National Guard. The two men had actually served together. Holloman told the officer that Wright was a relative and might have removed a nine millimeter handgun from his house two weeks earlier. Holloman suspected that Wright and defendant had guns in her automobile and noted that the two individuals had just left. Holloman gave the police the license plate number and make of the car as well as a description of the occupants. Minutes later, the police stopped the suspect car, which was occupied by Wright and defendant, several blocks from Holloman's house. The officers apprised both occupants of their reasons for stopping the vehicle. At that point, defendant, the front seat passenger, volunteered the fact that there was a BB gun in the glove compartment. The gun, which was operable and designed to resemble a .45 caliber semiautomatic handgun, was confiscated by the police. Both defendant and Wright were placed under arrest.
On the day following the arrest, the State Police notified the Jersey City Police Department that the fingerprints lifted from the Hightower crime scene matched those of Regina Wright. This information was relayed to Detective John Mondry who retrieved Wright's arrest file. Because defendant had been arrested with Wright, the detective concluded that both individuals might have participated in the robbery of the Hightowers. A photographic array was then shown to both Hightowers. Although Mrs. Hightower was unable to make a positive identification, Mr. Hightower selected defendant's picture. Mr. Hightower also later identified the BB gun that had been confiscated from Wright's automobile as the weapon that had been brandished by defendant during the robbery. Wright gave a written statement implicating defendant and subsequently entered a plea agreement with the prosecution. She was permitted to plead guilty to second degree conspiracy and was sentenced to a five year probationary term. As we noted earlier, Wright testified against defendant as a prosecution witness.

II.
We first consider defendant's attack upon the trial court's denial of his motion to suppress evidence. Defendant contends that the police violated his Fourth Amendment rights by stopping Wright's automobile. We disagree.
We begin our analysis with the well-settled principle that a police officer may effect an investigative stop on less than probable cause. State v. Ramos, 282 N.J.Super. 19, 21, 659 A.2d 480 (App.Div.1995). Investigatory detentions have been sustained as constitutional so long as the stop "is supported *722 by a reasonable suspicion that criminal activity is afoot." State v. Branch, 301 N.J.Super. 307, 318, 693 A.2d 1272 (App.Div. 1997), rev'd in part on other grounds, 155 N.J. 317, 714 A.2d 918 (1998). The essence of this standard is that the totality of the circumstances must be taken into account. Based upon "the whole picture," United States v. Cortez, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621, 629 (1981), the detaining officers must harbor a particularized suspicion grounded in "specific and articulable facts," State v. Ramos, 282 N.J.Super. at 21, 659 A.2d 480, that a suspect was, or is, engaged in criminal activity. See United States v. Hensley, 469 U.S. 221, 229, 105 S.Ct. 675, 681, 83 L.Ed.2d 604, 612 (1985); Delaware v. Prouse, 440 U.S. 648, 654-55, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660, 667-68 (1979); Terry v. Ohio, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889, 906-07 (1968); State v. Thomas, 110 N.J. 673, 678, 542 A.2d 912 (1988); State v. Davis, 104 N.J. 490, 504, 517 A.2d 859 (1986).
The police officer's duties include "vital preventive roles." State v. Dilley, 49 N.J. 460, 464, 231 A.2d 353 (1967). In the performance of these responsibilities, the officer should have the right to stop persons on the street for summary inquiry where the circumstances are "so highly suspicious as to call for such investigation." Ibid. These principles take on added significance in the context of investigations relating to firearms. Our Supreme Court has emphasized the need for a realistic approach to the dangers presented "by the modern proliferation of handguns." State in Interest of H.B., 75 N.J. 243, 245, 381 A.2d 759 (1977). "[T]he violent climate of the times" and the "universal threat" of such weapons, id. at 252, 381 A.2d 759, often require immediate police action in order to avert human catastrophe.
It is against this backdrop that we review the specific facts of this case. We are satisfied that the police conducted themselves reasonably in acting upon Holloman's complaint. Generally, some verification of an anonymous informant's disclosures of criminal activity, as well as a demonstration of his trustworthiness, are necessary in order to establish his credibility, so that such information may fairly and reasonably be assimilated as a proper basis for appropriate police action. See State v. Smith, 155 N.J. 83, 92, 713 A.2d 1033 (1998). Different considerations obtain when the source of the information is an ordinary citizen. See State v. Davis, 104 N.J. at 506, 517 A.2d 859; State v. Canola, 135 N.J.Super. 224, 230, 343 A.2d 110 (App. Div.), certif. denied, 69 N.J. 82, 351 A.2d 10 (1975) and modified, 73 N.J. 206, 374 A.2d 20 (1977); State v. Lakomy, 126 N.J.Super. 430, 434-35, 315 A.2d 46 (App.Div.1974); State v. Kurland, 130 N.J.Super. 110, 114-15, 325 A.2d 714 (App.Div.1974). There is an assumption grounded in common experience that such a person, in reporting criminal activity, would be motivated by factors consistent with law enforcement goals. An ordinary citizen may be regarded as trustworthy, and information imparted by him to a police officer concerning a criminal event "would not especially entail further exploration or verification of his personal credibility or reliability before appropriate police action is taken." State v. Lakomy, 126 N.J.Super. at 435, 315 A.2d 46. Here, the police were not dealing with a faceless member of the criminal milieu but instead with an ordinary citizen with whom they were acquainted. The reactive measures taken by the officers for the limited purpose of neutralizing a potentially dangerous situation comported with constitutional strictures.
We add that independent police investigation corroborated material aspects of Holloman's statement. Specifically, Wright's automobile matched the detailed description given by Holloman and was stopped within several blocks of Holloman's house. Although the presence of Wright's car in the immediate vicinity of Holloman's house was not necessarily an incriminating circumstance, it tended to confirm the information that had been given to the police. State v. Zapata, 297 N.J.Super. 160, 173, 687 A.2d 1025 (App.Div.1997). Under these circumstances, the police would have been derelict in their duty had they merely shrugged their shoulders and allowed a crime to occur or a criminal to escape.

III.
We next examine defendant's contention that he was prejudiced by a police officer's *723 reference to his "criminal jacket." No objection was interposed. We find no error, much less plain error.
Upon receiving information from the State Police that Regina Wright's fingerprints matched those found at the scene of the crime, Detective Mondry retrieved Wright's "criminal jacket." The detective learned that Wright had been arrested with defendant. This fact prompted Detective Mondry to obtain defendant's criminal jacket, and to consider the similarities between the pellet gun confiscated from the glove compartment of Wright's automobile and the weapon used during the robbery as described by Mr. Hightower. Based upon the information compiled, a photographic array was presented to both victims, resulting in Mr. Hightower's selection of defendant's picture.
In the context of these facts, Detective Mondry's references to Wright's and defendant's "criminal jackets" contained no improper implication of their participation in other unrelated criminal activity. These references were obviously understood by the jury to refer to the earlier arrest of defendant and Wright and the seizure of the pellet gun. Clearly, these references did not have the capacity to lead to an unjust result.

IV.
Defendant asserts that the prosecutor exceeded the bounds of fair comment in his summation by describing the reasons for permitting Wright to plead guilty to a second degree crime and receive a lenient sentence. The prosecutor's comments must be considered within the context of defense counsel's closing statement in which he sharply criticized the plea agreement that allowed Wright to escape just punishment. See State v. Wilson, 128 N.J. 233, 241-42, 607 A.2d 1289 (1992); State v. Lane, 288 N.J.Super. 1, 12, 671 A.2d 1045 (App.Div.1995); State v. Darrian, 255 N.J.Super. 435, 454-55, 605 A.2d 716 (App.Div.), certif. denied, 130 N.J. 13, 611 A.2d 651 (1992); State v. Engel, 249 N.J.Super. 336, 379, 592 A.2d 572 (App.Div.), certif. denied, 130 N.J. 393, 614 A.2d 616 (1991). Many of the prosecutor's remarks were intended to rebut defense counsel's claim that Wright's testimony was motivated by a desire to curry favor with the State and to attack the implication that the prosecutor had acted unethically in offering a reduced sentence in return for her cooperation. Plea bargaining is viewed with suspicion by a substantial segment of the public, and the prosecutor, in responding to defense counsel's summation, was merely attempting to acquaint the jury with the dirty realities of combatting crime. We perceive no error warranting a reversal of defendant's conviction.

V.
Finally, we perceive no sound basis to disturb the sentence imposed on the armed robbery conviction. While defendant received a harsh sentence and Wright a lenient one, their situations were wholly dissimilar.
Wright provided meaningful cooperation with the prosecution. The sentencing court properly took into account the prospects for her redemption, and, in assaying those prospects, her attitude toward the truth was not irrelevant. State v. Poteet, 61 N.J. 493, 496, 295 A.2d 857 (1972). In contrast, defendant elected to contest his guilt. While due process would undoubtedly be denied if further punishment were inflicted on defendant for choosing to exercise his constitutional right to defend, the sentencing court was not obliged to take a wooden approach and refuse to reward Wright for her cooperation. It would be grossly unfair to the many if all had to be sentenced without regard to their candid acknowledgment of guilt or their aid to the prosecution in coping with crime.
So too, the roles of defendant and Wright in the criminal event were strikingly dissimilar. Defendant was the principal protagonist, repeatedly terrorizing the elderly victims with a gun. Wright acted in a sympathetic fashion to the victims.
And lastly, the backgrounds of defendant and Wright were as dissimilar as their respective roles in committing the crimes. This was not defendant's first brush with the law. Much of defendant's life has been devoted to criminal conduct. Wright stood before the sentencing court with no convictions.
While we find no reason to intervene respecting the sentence imposed on the armed robbery conviction, we are obliged to vacate defendant's conviction for conspiracy. The conspiracy merged into defendant's conviction *724 for armed robbery. We also vacate the sentence imposed on defendant's conviction for possession of a handgun without a permit. The sentencing judge erroneously believed that this conviction was for a Graves Act offense and sentenced defendant accordingly. See N.J.S.A. 2C:43-6c.

VI.
We would be remiss were we to fail to mention the excellent quality of the briefs submitted by Assistant Deputy Public Defender Susan Brody and Assistant Hudson County Prosecutor Robert Butler. They are to be commended.
The conviction and sentence imposed for first degree robbery are affirmed. The conviction for second degree conspiracy is vacated. The sentence imposed on the conviction for possession of a handgun without a permit is vacated. The matter is remanded to the Law Division for resentencing on that count and for appropriate modification of the judgment.