887 A.2d 715 (2005)
382 N.J. Super. 44
STATE of New Jersey, Plaintiff-Respondent,
v.
Edward J. ROMAN, Sr., Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 1, 2005.
Decided December 23, 2005.
*718 Thomas J. Gosse Haddon Heights, argued the cause for appellant.
Analisa Sama Holmes, Deputy Attorney General, argued the cause for respondent (Peter C. Harvey, Attorney General, attorney; Ms. Holmes, of counsel and on the brief).
Before Judges KESTIN, LEFELT and SELTZER.
The opinion of the court was delivered by
LEFELT, J.A.D.
Defendant Edward Roman is serving a twenty-seven-year prison term for first-degree aggravated manslaughter, N.J.S.A. 2C:11-4a, as a lesser included offense to murder, of his seven-week-old son, Edward Jr. On appeal, defendant argues that Judge Carmen Alvarez erred by failing to (1) suppress defendant's statement given at the hospital; (2) suppress defendant's September 26th statement given at the prosecutor's office; (3) sever the murder charge from the remaining charges of aggravated assault and endangering the welfare of Edward Jr. and Edward's twin; and (4) instruct the jury that they could not consider evidence presented in support of the aggravated assault and endangering charges as evidence of murder. Defendant further argues that additional error occurred when (5) the court allowed the prosecutor to cross-examine defendant on the details of his past burglary conviction and related statement, which defendant had given to a detective; (6) the prosecutor committed misconduct from opening through summation; (7) trial counsel rendered ineffective assistance, by failing to seek severance of the charges, to seek limiting instructions regarding the charges, and to object to the prosecutor's misconduct; (8) the court allowed Dr. Lind to testify about the cause of Edward Jr.'s death; and (9) the court imposed an excessive twenty-seven-year imprisonment term.
We have reviewed each of these arguments in light of the record and pertinent law and have concluded that none of the arguments warrant reversal of defendant's conviction or sentence, and that points (1) and (3) through (5) and (7) through (9) are without sufficient merit to warrant further discussion. R. 2:11-3(e)(2). Consequently, in this opinion, we discuss only defendant's argument (6), dealing with the prosecutor's alleged misconduct, and defendant's argument (2), claiming that the trial court erred, under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), when it denied defendant's motion to suppress his September 26th confession, which was obtained despite defendant's request to speak with his parents.

I.
Here is what happened. Defendant and his girlfriend, Melanie Holton, were the *719 parents of twin seven-week-old boys. Holton, the grandparents, and the babies' godfather and defendant's best friend, Michael Wilkins, all testified that defendant appeared, before the unfortunate incident to be a loving, protective, and fully involved parent of the newborns.
On September 23, 2001, however, defendant was babysitting the newborns while Holton was shopping with a friend. While the newborns were in defendant's care, Edward Jr. died. Defendant's initial version of the death, which he provided during a 9-1-1 call and thereafter at the hospital, was that Edward Jr. fell off a couch while defendant was assisting the other twin.
An autopsy revealed, however, that Edward Jr. died from multiple skull fractures, hemorrhaging, front subdural bleeding and a swelling of the brain that was allegedly caused by blunt force to two different parts of his head. The autopsy also revealed twenty-seven fractures of the newborn's ribs in various stages of healing. An examination of the other twin disclosed seventeen rib fractures also in different stages of healing. Consequently, during the investigation of Edward Jr.'s death, the Division of Youth and Family Services temporarily removed the other twin from the care of defendant and Holton.
On September 25th, the prosecutor's office followed up on some statements taken at the hospital and further interviewed defendant and Holton. During this interview, the officers were informed that Holton's parents had retained an attorney to represent the couple. The attorney requested that the police stop interviewing defendant and Holton and inform the couple that he advised them to stop speaking with the police. The officers informed defendant of the representation and gave him the lawyer's phone number.
At trial, the officer could not recall whether he had also informed defendant of the attorney's advice to stop speaking with the police. Defendant testified at trial that after being given the attorney's phone number he asked the officers what the attorney had said. The officers allegedly responded that they did not know, but if defendant did not do anything wrong, he did not need an attorney.
In any event, one of the officers asked defendant whether he wished to continue speaking with them and defendant agreed by signing a "Reed Advisory."[1] Defendant also signed a Miranda Warning and Waiver of Rights form and continued speaking with the police until counsel arrived, when defendant exercised his right to remain silent.
That night, one of the investigators received a message from defendant's father on his home answering machine. Defendant's father and the investigator knew each other and had a social relationship. When the investigator called back, defendant's father asked the whereabouts of his son and "what was going on." The investigator explained that "everything was going fine with the questioning and they had a few more questions to answer, but the lawyer stopped it all" and that defendant "should come back and finish his statement." The investigator told the father that "the autopsy wasn't matching up with the questioning of ... the statements that [defendant] was making." Defendant's father told the investigator that his son *720 wanted to return to clear everything up. Defendant's father asked how his son could come in or continue the statement. The investigator advised defendant's father that his son "ha[d] a right to hire a lawyer and ... a right to fire a lawyer[.]"
Later that evening, defendant came to his parents' home seeking advice. Apparently trusting the investigator, defendant's father told defendant to go back the next day and finish the statement without the attorney. Defendant also spoke with his friend, Wilkins, who also encouraged defendant to go back and continue the statement.
The next day, September 26th, defendant fired his attorney and reported to police headquarters where an investigator and detective continued defendant's interrogation. Defendant received Miranda warnings and waived his right to an attorney, expressing his desire to revoke the previously asserted right to remain silent and continue with his statement.
Defendant began his statement by discussing the details of the children's birth, development, and care. The investigator was impressed with defendant's knowledge of his children and suspected, at that time, that defendant was a very involved, interested parent. When asked about the events of September 23rd, defendant repeated his original explanation of the incident. But, this time, the investigator confronted defendant with the autopsy report and said there were "two kids in your house who are seven weeks old. One kid is dead and the other kid is following the same path, got multiple injuries." Considering "the autopsy, it didn't happen the way you said it. Now there's something very wrong here and this is what we need to talk about." The investigator explained that the baby "could not get injuries... more than one head fracture[,] from one fall," by falling off a couch of that height. At this point, "the tenseness in the room was ratcheted up."
Defendant then decided to tell the investigator something he "really never told" anyone and divulged the following second version of the incident: "in his haste to save the baby," after Edward Jr. had fallen from the couch, "he had picked the baby up and had run toward the bedroom where he was going to do CPR. But, in his haste, he tripped and the baby fell out of his arms and now he hit the floor." When questioned about the newborn's old injuries, however, defendant could not provide any credible explanation. The investigator was not impressed with the second version and kept pressing defendant, who then came up with a third version of the incident.
In the third version, defendant stated that, when he dropped the baby, "he actually slid across the floor and he hit the wall with some force." The investigator again expressed his disbelief, but did not threaten, coerce, or scream. In fact, throughout the examination, the investigator claimed to have treated defendant as if he were a father with a dead son, not a criminal suspected of murder.
At some point according to defendant, both the investigator and detective left the room, and a woman lieutenant entered and began questioning him. She told defendant that he was lying and that his other son was going to be placed for adoption. At that moment, defendant claimed to be very upset and testified at trial that he decided to tell the investigators "whatever they want[ed] to hear."
The investigator disagreed with defendant's recollection of this occurrence. He testified that the lieutenant, who was his superior officer, did not enter the room until after the confession.
*721 In any event, after the investigator had informed defendant that his stories were not jibing with the physical evidence, and the tension had been significantly increased, defendant asserted that he needed "to talk to my parents; I want to talk to my father."[2] The interrogating investigator, tried to find out precisely what defendant meant. The investigator asked "do you want to tell your father first, and you're going to tell us?" In response, defendant said "I want to talk to my father." The investigator then sat for maybe thirty seconds, "mulling over where we were." He then got up and told defendant he was "going to go get your father," and he left the room.
The investigator did not attempt to contact defendant's father. Instead, he spoke to his superiors and wanted to check on the status of the interview with Holton, who was also being questioned at that time. About two or three minutes later, the investigator reentered the interrogation room intending to tell defendant they were bringing in his father. When the investigator reentered the room, defendant was sobbing and telling a detective that he was the murderer who killed his son.
The detective, who had remained with defendant after the investigator left the room, explained at trial that when the investigator left, he thought defendant's parents would be brought in. He "wasn't sure what was going to happen next." He asked defendant, according to his trial testimony, "what's going on? ... what do you want to talk to your parents about and [defendant] says don't worry ... I'll tell you what happened after I talk to my parents." The detective stated that he had "known [defendant] for a while .... you want to tell me?" Defendant then "became very emotional and he put his hands up like this and he said I murdered my son." Defendant then explained how he "lost it" and "slammed the baby in between [his] knees because he wouldn't stop crying." The detective was "shocked" and slid his chair toward defendant, putting his arm on defendant's shoulder to "comfort" him.
Upon the investigator's return, defendant was crying: "I'm a murderer; I killed my son; I'm a murderer."
Defendant subsequently repeated the confession to his parents and in a tape recorded statement. However, defendant denied ever striking the babies before, but admitted to having been tempted to do so in the past. He then stated that all previous versions of the incident were not true. After the recording was over, defendant listened to the tape and signed an affidavit acknowledging his taped statement and swearing that it was given voluntarily and truthfully.
At trial, three medical experts testified that Edward's injuries were the result of intentional infliction of child abuse. The head fractures were most likely caused by a forceful striking of the head, although one expert believed the fractures "could also have occurred were the head to have been squeezed between the knees of the individual holding him." The experts also opined that the rib fractures on both left and right sides of Edward Jr.'s rib cage were consistent with squeezing the newborn. They were not caused, as urged by the defense, at birth, by administering CPR, or by hugging or burping the babies. The experts also believed that all of the fractures did not occur on the day of Edward *722 Jr.'s death, but some of the child's ribs had been broken previously.
Defendant testified on his own behalf. He first admitted pleading guilty as an accessory to third-degree burglary when he was twenty years old. He then testified to his girlfriend's high risk pregnancy and delivery of the twins. He portrayed himself as an involved concerned parent, helping with doctor appointments and caring for the babies.
He explained the September 23rd incident as follows: he was exhausted and trying to feed Edward Jr., but the baby refused to take the formula and was moving his head from side to side screaming. Defendant grabbed Edward Jr. and unintentionally hit him against his knee caps once and the baby became unconscious. As a result, formula started to come out of the newborn's mouth and nose, and defendant ran into his bedroom trying to suction formula and blow air into the baby's lungs.
Defendant admitted lying about the incident to the 9-1-1 dispatcher, the police, hospital personnel, his parents, and friends. He stated that he told the investigators what they wanted to hear because he wanted his other son to stay with Holton and because he felt scared and confused. He denied shaking, squeezing, or abusing his children.
The jury acquitted defendant of aggravated assault, pertaining to the twins, and of endangering the welfare of both twins for the period preceding Edward Jr.'s death. However, the jury found defendant guilty of aggravated manslaughter, as a lesser included offense to first degree murder, of Edward Jr. After being sentenced to twenty-seven years in prison with application of the No Early Release Act, N.J.S.A. 2C:43-7.2, defendant appealed to this court.

II.
Defendant argues, in point (6), that the prosecutor committed misconduct through the entire trial, by making "inflammatory remarks" designed solely to "generate sympathy for the victim and [] hatred for the defendant" and by improperly cross-examining defendant.
"[R]hetorical excesses ... invariably attend litigation," State v. Williams, 113 N.J. 393, 456, 550 A.2d 1172 (1988), and prosecutors are afforded considerable leeway in their remarks to a jury. State v. Purnell, 126 N.J. 518, 540, 601 A.2d 175 (1992). Nevertheless, as we have said numerous times, the prosecutor's primary duty is not to obtain convictions, but to see that justice is done. E.g., State v. Frost, 158 N.J. 76, 83, 727 A.2d 1 (1999). Prosecutors must avoid "improper methods" to obtain convictions. State v. Smith, 167 N.J. 158, 177, 770 A.2d 255 (2001). In this case, particular circumspection by the prosecutor was necessary.
The evidence against defendant was powerful. For example, medical testimony opined that the skull fractures on both sides of the child's head were caused either by squeezing the head between an adult's knees or by swinging the baby's body with full force against a wall, table or floor, hitting the baby on one side of his head and then swinging again and hitting the other side of the head. Because of the great emotion and sympathy this evidence could generate for the infant victim, the State's attorney was obligated to prosecute with great care.
The assistant prosecutor who presented the state's case nevertheless structured her opening around the characterizations "unthinkable" and "unspeakable" to describe the conduct attributed to defendant. That formulation was used no less than eight times in a relatively brief opening *723 statement. Toward the end of the prosecutor's opening, she urged the jury, after all of the evidence was admitted, to deliberate fully, and to decide "what witnesses are credible and what witnesses aren't credible, whose opinion you're going to believe, whose opinion you're not going to believe." She then stated as her last thought, "keep this in mind. He is the one who's responsible for the unthinkable. He is the one who's responsible for the unspeakable. And let that speak volumes in your verdict."
The tone of the opening statement generally, with its unduly repetitive emphasis on the "unthinkable" and the "unspeakable," could well be viewed as an appeal to the jury's passions rather than an argument focusing on the facts to be proved. And, the peroration only fortified the offending theme. The choice of words and the manner of presentation qualify, in the circumstances, contextually, as prosecutorial misconduct. Not only did the prosecutor seemingly vouch for the guilt of defendant, but she also impliedly told the jury to send a message by requesting that they "speak volumes" in the verdict. See State v. Farrell, 61 N.J. 99, 103, 293 A.2d 176 (1972); State v. Buscham, 360 N.J.Super. 346, 364-65, 823 A.2d 71 (App.Div.2003).
The prosecutor also stated in opening that "[y]ou don't want to talk about things that are seen on kids. I mean we're all adults, it's our job to protect them." This comment contains the same distortion as the statements we criticized in Buscham, supra, 360 N.J.Super. at 364-65, 823 A.2d 71, and State v. Acker, 265 N.J.Super. 351, 354-57, 627 A.2d 170, certif. denied, 134 N.J. 485, 634 A.2d 530 (1993). It is not the jury's function to protect anyone. Buscham, supra, 360 N.J.Super. at 365, 823 A.2d 71. "The jury's role was to determine whether the State had proven its case against this defendant beyond a reasonable doubt." Ibid.
Yet, in addition to the flaws we have described, the prosecutor detailed for the jury the evidence that she would be presenting during the trial to establish defendant's guilt. In considering the opening statement taken as a whole, we interpret the accusatory elements and the last thought expressed, as merely an inartful pledge to the jury that the evidence at the end of the trial would demonstrate the guilt of defendant. With all of the highlighted defects in mind in the context of the case considered as a whole, we do not conclude that a reversal is warranted on those bases, alone or in combination with other flaws we discuss below.
Defendant also alleges prosecutorial misconduct in other phases of the trial. For example, defendant attempted to explain the differences between his testimony and his prior inconsistent statements by focusing on the time he had to gather his thoughts and think clearer. The prosecutor cross-examined by stressing that defendant had access to the State's case through discovery and "had the opportunity to listen to every one of the State's witness[es]." Our Supreme Court has stated clearly that a prosecutor may cross-examine a defendant about tailoring testimony when "there is evidence in the record that a defendant tailored his testimony,"... [but] "at no time during cross-examination may the prosecutor reference the defendant's attendance at trial or his ability to hear the testimony of preceding witnesses." State v. Daniels, 182 N.J. 80, 99, 861 A.2d 808 (2004) (emphasis added). The line of cross-examination the prosecutor employed here clearly violated that standard.
Defendant further objects to the prosecutor attempting to demonstrate in cross-examination that defendant "was *724 nothing more than a despicable liar." A prosecutor must, of course, refrain from using epithets about a defendant or his character. See, e.g., State v. Clausell, 121 N.J. 298, 341, 580 A.2d 221 (1990). In this matter, however, defendant had advanced several prior versions of what had occurred to Edward Jr. In these circumstances, cross-examination about defendant's changing stories was completely proper, as was an argument to the jury inviting its disbelief. At worst, the prosecutor here was guilty only of hyperbole. In State v. Morton, 155 N.J. 383, 457, 715 A.2d 228 (1998), for example, our Supreme Court did not find reversible error even when the prosecutor characterized defendant's testimony as a "self-serving pack of lies." This was so because the Court concluded that the comment "was based on reasonable inferences drawn from the evidence presented during the trial." Id. at 457-58, 715 A.2d 228. So too here. There is no ground for reversal on this basis.
Defendant also complains about the portions of the prosecutor's summation in which she stated "I know [defendant] had exclusive control over this child and did something to that child's head that was so horrific he sent him into respiratory arrest and cardiac arrest." Later, the prosecutor explained that the child's distress would "give you the heebie-jeebies" and several times repeated her description of the serious bodily injury suffered by the newborn as "horrific."
We consider the statement referring to respiratory and cardiac arrest together with the "heebie-jeebie" and "horrific" observations, to be fair comment based upon the evidence and not objectionable, because they were well grounded in the evidence. In Morton, for example, the Court found the evidence supported the prosecutor's reference to defendant as a "cold-blooded killer." Morton, supra, 155 N.J. at 457, 715 A.2d 228. As explained in Farrell, supra, 61 N.J. at 103, 293 A.2d 176, a prosecutor's expression of personal belief is error only when the jury understands the belief to be based upon information outside the evidence, which was not the case here. The single comment, "I know ..." did not, in context, suggest that the prosecutor's view was based on personal knowledge unavailable to the jury.
We do not expect prosecutors "to act in a manner appropriate to a lecture hall." Acker, supra, 265 N.J.Super. at 356, 627 A.2d 170 (citing State v. Johnson, 31 N.J. 489, 510-11, 158 A.2d 11 (1960)). A prosecutor may present her case forcefully within the bounds of advocacy "established by decisional law." Id. at 356, 627 A.2d 170 (quoting State v. Marshall, 123 N.J. 1, 160-161, 586 A.2d 85 (1991)). So long as a prosecutor bases her comments and inferences on facts in the record, "what is said in discussing them, `by way of comment, denunciation or appeal, will afford no ground for reversal.'" Smith, supra, 167 N.J. at 178, 770 A.2d 255 (2001) (quoting Johnson, supra, 31 N.J. at 510, 158 A.2d 11).
To explain why Edward Jr.'s rib fractures were not accidents, however, the prosecutor used a football-player analogy. Even allowing for the considerable leeway prosecutors enjoy in fashioning arguments, and the need to rebut forcefully defendant's contrary arguments, see State v. Williams, 317 N.J.Super. 149, 158, 721 A.2d 718 (App.Div.1998), certif. denied, 157 N.J. 647, 725 A.2d 1128 (1999), the football-player analogy was potentially misleading.
Expert testimony had offered the opinion that because a newborn's ribs are "flexible and pliable," great force by compression is required to induce a fracture, such as that which would result from a fall *725 from a third floor window or the intentional use of force. The prosecutor attempted to explain the amount of force necessary to crack a newborn's ribs by, in essence, inviting the jury, with no support in the experts' analyses, to imagine the force required to break a professional football player's ribs. She then asked the jury rhetorically "[s]o what kind of force [upon the newborns] do you really think is necessary to inflict those rib fractures?" She went on and stated, "[w]hatever it is you're thinking about probably can't compare to what he did to these kids." The invited comparison was inappropriate and created a danger of undue prejudice to defendant.
We, therefore, agree with defendant that prosecutorial excesses occurred in the opening statement and that misconduct transpired when the prosecutor argued that adults need to protect children, analogized the newborns' broken ribs to a football player's, and cross-examined by implying that defendant's presence during the presentation of the State's case was improper. Yet, such flaws alone do not justify a reversal of the conviction.
To reverse defendant's conviction, the prosecutorial misconduct must be so severe as to deprive defendant of a fair trial. State v. Josephs, 174 N.J. 44, 124, 803 A.2d 1074 (2002). We are mindful, moreover, that defendant did not object to any of the claimed improprieties. "The failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made." Frost, supra, 158 N.J. at 84, 727 A.2d 1. The absence of objection deprived the trial judge of an opportunity to correct the error at the time calling for application of the plain error standard of review. See R. 1:7-5.
Our review of the record by that standard leads us to conclude that the prosecutor's misconduct did not cause the jurors to reach a result that they would not otherwise have reached. See R. 2:10-2. When all of the offending conduct is considered against the strength of the State's evidence, we cannot conclude that the prosecutor's tactics deprived defendant of a verdict that fairly reflected the evidence. See, e.g., State v. Negron, 355 N.J.Super. 556, 578-79, 810 A.2d 1152 (App.Div.2002)(determining that a reversal was required because, in balancing the prosecutorial misconduct against the strength of the proofs, "we [were] left without the requisite sense of confidence that the verdict was the result of a jury assessment of permissible considerations based on the evidence in the case"). The evidence against defendant was strong and could easily have justified the murder conviction sought by the prosecutor, yet defendant was acquitted of murdering Edward Jr. and convicted of lesser-included aggravated manslaughter. Defendant was also acquitted of the endangering and aggravated assault charges that related to his conduct toward both twins preceding Edward Jr.'s death. It seems evident that, because the charges of conduct preceding the infant's death were based upon the forty-four fractured ribs of the newborns, the jury apparently was not swayed by the prosecutor's misleading football-player analogy.
Accordingly, we reject argument (6) and proceed to discuss defendant's argument (2), the claimed Miranda violation, pertaining to defendant's September 26th confession.

III.
Judge Alvarez denied defendant's suppression motion because it focused on defendant's re-appearance after firing his attorney. No findings were made concerning the occurrences following defendant's *726 request to speak with his parents because defendant did not raise this argument until he appealed. Ordinarily, we might return this issue to the trial court for further findings. However, the evidence is rather clear and mostly uncontested. Consequently, as the Supreme Court did in State v. Bey II, 112 N.J. 123, 140, 548 A.2d 887 (1988), we make our own findings and conclude that defendant's argument is wanting. See R. 2:10-5.
Judge Alvarez felt defendant's rights were fully protected by being "re-Mirandized" when he returned for further questioning. The judge concluded that "to suggest that the authorities should have done anything but what occurred here would make interrogations impossible." The court believed that "defendant's waiver of his right to remain silent and his right to counsel was knowingly, intelligently and voluntarily made." We basically agree with these observations.
It is apparent to us that defendant's father, perhaps motivated by defendant's protestations of innocence, wished to have defendant speak with the police ostensibly to clear up this matter. Obviously, the investigating officers were interested in keeping defendant cooperative. It is also important to realize that in the beginning and indeed through most of defendant's interrogation, the police were uncertain whether they were dealing with a criminal or a distraught father who had just lost his son through an unfortunate accident. In fact, the police described the discussions with defendant, who was known by several of the officers, as an interview rather than an interrogation.
The statement to defendant's father, which was made the night before defendant returned for further questioning, that lawyers can be hired and can also be fired, was made in response to the father's question about how his son could continue to cooperate. Defendant's father had a previous relationship with this officer who was described as "soft-spoken" with a "grade-school teacher" demeanor.
The communication implicitly suggested that defendant would be better off speaking to the police, and attempting to explain the discrepancies in his story, than remaining silent as cautioned by his lawyer. This implicit suggestion, within another context, could be considered deceptive and an impairment of defendant's right to the unrestricted advice of counsel. See State v. Kennedy, 97 N.J. 278, 289, 478 A.2d 723 (1984) (noting that "the State may not interfere with or prevent defendant's relationship with his attorney."). Here, however, the record reflects that defendant's father was the motivating force in requesting a means to allow his son to finish his statement.
Defendant undoubtedly accepted his father's advice and returned to the prosecutor's office after firing his attorney. He promptly waived his right to silence and began answering questions asked by a detective and investigator. The interrogating officers continued to press defendant for explanations regarding the discrepancies between his story and the autopsy and physical evidence. At a particularly tense moment in the questioning, defendant requested to speak with his parents.
If a defendant "indicates in any manner, at any time ... during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, supra, 384 U.S. at 473-74, 86 S.Ct. at 1627, 16 L.Ed.2d at 723. Once a defendant invokes his or her right to remain silent, the invocation must be scrupulously honored. Michigan v. Mosley, 423 U.S. 96, 103-04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 321 (1975). A defendant's request to terminate an interrogation must be honored, "however *727 ambiguous." Bey II, supra, 112 N.J. at 123, 548 A.2d 887, (quoting State v. Hartley, 103 N.J. 252, 263, 511 A.2d 80 (1986) (quoting Kennedy, supra, 97 N.J. at 278, 478 A.2d 723 (1984))).
Not merely the words spoken, however, but the full context in which they were spoken have to be considered in determining whether there has been an invocation of the right to remain silent. State v. Martini, 131 N.J. 176, 231-32, 619 A.2d 1208 (1993). (Martini's request to speak with a co-defendant was found not to be an invocation of the right to remain silent). In State v. Brooks, 309 N.J.Super. 43, 52-57, 706 A.2d 757 (App.Div.), certif. denied, 156 N.J. 386, 718 A.2d 1215 (1998), which the State relies upon, we found defendant did not assert his right to silence when he asked to speak to his mother because defendant was not seeking his mother's advice.
Although both Martini and Brooks found that defendant did not invoke his right to silence, in those cases defendants' requests to discontinue the interrogations were immediately granted by the police. Here, defendant's request to speak with his parents was not immediately granted, and the detective did not re-administer Miranda warnings before asking defendant what "he had to talk to his parents about."
In State v. Harvey, 121 N.J. 407, 581 A.2d 483 (1990), cert. denied, 499 U.S. 931, 111 S.Ct. 1336, 113 L.Ed.2d 268 (1991), defendant requested to speak with his father during the interrogation. Harvey said "he would tell [them] about the murder but he first wanted to speak to his father." Id. at 417, 581 A.2d 483. The police in Harvey granted his request and then resumed interrogation three and one half hours later without re-administering Miranda warnings. Id. at 417-18, 581 A.2d 483. The Supreme Court held that defendant's request to speak to his father before telling the police about the murder invoked his right to remain silent, and the police were required to give fresh Miranda warnings before recommencing questioning and obtaining his confession. Id. at 419-421, 581 A.2d 483.
Although defendant's request is quite similar to that contained in Harvey, the situation here is different. As we made clear in Brooks, it is "not merely the words spoken, but the full context in which they were spoken" that determines "whether there had been an invocation of the right to remain silent." Brooks, supra, 309 N.J.Super. at 55, 706 A.2d 757 (citing Martini, supra, 131 N.J. at 231-32, 619 A.2d 1208).
In Harvey, it was clear that defendant was uncooperative and did not want to speak with the police. As the Court noted in Martini, Harvey's "`conduct during three days of interrogation and his refusal to answer questions' were expressions of his unwillingness to talk with police." Martini, supra, 131 N.J. at 232, 619 A.2d 1208 (quoting Harvey, supra, 121 N.J. at 419, 581 A.2d 483). In addition, when Harvey was finally given "a new set of Miranda warnings after his oral confession[] `[d]efendant immediately demanded an attorney before any statement could be reduced to writing.'" Ibid. (quoting Harvey, supra, 121 N.J. at 420, 581 A.2d 483).
In our case, defendant never gave the police any indication that he wanted to stop talking. At best, he indicated that he wanted to take a break from the interrogation to speak with his parents. As our Supreme Court explained in Bey II, supra, 112 N.J. at 136-37, 548 A.2d 887, "[l]aw enforcement officials ... are not obligated to accept any words or conduct, no matter how ambiguous, as a conclusive indication that a suspect desires to terminate questioning." *728 The police need not accept at face value a defendant's request for a break in the interrogation as an assertion of the right to silence. The police are free to inquire as to the reason for the request. That is what occurred here.
When the detective asked why defendant wished to speak with his parents, the detective did not violate defendant's constitutional rights. Bey II, supra, 112 N.J. at 136-37, 548 A.2d 887. He was merely attempting to discern whether defendant was invoking his right to silence. It is only an actual invocation of the right to silence that activates the bright-line rule of Hartley and requires reiteration of defendant's Miranda rights before any further questioning is undertaken. Hartley, supra, 103 N.J. at 255-58, 511 A.2d 80 (Hartley's invocation of his right to silence was "I don't believe I want to make a statement at this time.").
Defendant's request to speak with his parents should have been granted. Nevertheless, defendant volunteered his confession before the investigator returned with the alleged intention of telling defendant that his parents were going to be brought in.
To hold that the detective had to re-administer Miranda warnings before asking why defendant wished to speak with his parents, would be contrary to Bey II and Martini. During an interrogation, the police are permitted to attempt to determine whether a request to take a break from the interrogation is in fact an assertion of a defendant's right to remain silent. Obviously, once defendant invokes his right to silence, the police are obligated to respect defendant's choice immediately, without question, and without any attempt at dissuasion. See Michigan, supra, 423 U.S. 96 at 103-04, 96 S.Ct. at 326, 46 L.Ed.2d at 321.
Under the circumstances, however, we conclude that defendant's request to speak with his parents was clarified by the detective as not being a re-assertion of his right to silence. In fact, during trial, on direct examination, defendant was asked "why did you want to see your parents," and defendant answered, "I wanted to tell them, you know, what I was going to do." Accordingly, additional Miranda warnings were not necessary, and Judge Alvarez did not err by declining to suppress the oral and written confessions of September 26th, which followed defendant's request to speak with his parents.
Affirmed.
NOTES
[1] State v. Reed, 133 N.J. 237, 269, 627 A.2d 630 (1993) (when officers know that "an attorney has been retained on behalf of a person in custody on suspicion of crime and is present or readily available to assist that person, the communication of that information to the suspect is essential to making a knowing waiver of the privilege against self-incrimination[.]")
[2] The following account of the circumstances surrounding defendant's request to speak with his parents is derived from the testimony presented at the motion to suppress, unless trial testimony is specifically referenced.