**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0390-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOHNATHAN D. MORGAN,
a/k/a JONATHAN D. MORGAN,

    Defendant-Appellant.

_____

          Submitted January 17, 2018 — Decided July 24, 2018

          Before Judges Carroll and Leone.

          On appeal from Superior Court of New Jersey,
          Law Division, Union County, Indictment No.
          11-04-0373.

          Joseph E. Krakora, Public Defender, attorney
          for appellant (Theresa Yvette Kyles, Assistant
          Deputy Public Defender, of counsel and on the
          briefs).

          Ann M. Luvera, Acting Union County Prosecutor,
          attorney for respondent (Milton S. Leibowitz,
          Special Deputy Attorney General/Acting
          Assistant Prosecutor, of counsel and on the
          brief).

          Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Johnathan D. Morgan appeals his May 1, 2015 judgment of conviction for second-degree robbery and felony murder.[1]  We affirm.

I.

The following facts were elicited during defendant's trial. At 4:02 a.m. on September 28, 2010, a male caller placed a phone call from a blocked number to United Taxi Company and requested to be picked up at a West Sixth Street address in Plainfield.[2]  The late-night dispatcher, Jimmy Morel, sent driver Jose Gomez to pick up the caller.

Gomez testified as follows.  When he arrived at the West Sixth Street address, a man approached his cab and attempted to get in the backseat.  Gomez noticed the man was hesitant to fully enter the vehicle and recoiled when the interior light came on as the door opened.  As the man backed out of the rear door of the taxi, Gomez saw what looked like a silver gun in the man's left hand.  Gomez immediately drove away with the rear door of the cab

---

[1] The judgment of conviction was amended September 24, 2015.

[2] At trial, expert Adam Durando testified that adding the prefix *67 to an outgoing call from a cellular phone prevents the receiving phone from reading the caller ID information, and thus the incoming number comes up as "blocked."

still open, leaving the man behind. After he had driven a few blocks, Gomez called the police and Morel to report the incident.

Morel testified as follows. At around 5:35 a.m. that morning, he received a call from a man using a blocked number requesting to be picked up at an address on Spooner Avenue in Plainfield and dispatched driver Isidro Leonardo. Morel later became concerned that Leonardo had not contacted him to let him know he had dropped off the man from Spooner Avenue and was available to pick up his next fare. Morel's attempts to reach Leonardo were unsuccessful. Gomez was near Spooner Avenue, so Morel asked him to drive by and see if he could determine what was happening with Leonardo.

Gomez testified that he arrived at the Spooner Avenue location at the same time as a police officer. They found Leonardo's taxi pinned against another vehicle. Leonardo was unconscious in the driver's seat and had been shot in the back of the head. Leonardo was taken to the hospital where he later died.

A police investigation found a palm print made by co-defendant Wallace Parrish on the partition between the front and rear seats of Leonardo's taxi. A review of phone records revealed that the blocked phone number that called Morel and requested a pick up on West Sixth Street, came from a cell phone registered to Parrish's cousin who testified that Parrish was using his old phone. The call that had requested a taxi be sent to Spooner Avenue had come

from a cell phone number registered to R.C. She testified that phone number belonged to L.N., with whom she had a child. R.C. further testified that L.N. was incarcerated during the summer and fall of 2010, and that during this time, he instructed her to contact defendant, L.N.'s cousin, at that phone number if she needed anything for the child while L.N. was locked up. R.C. testified that during the summer of 2010, she contacted defendant at that number in order to get diapers for her child.

Phone records for that number documented it was used to make blocked calls to several taxi companies from approximately 4:30 to 5:30 a.m. on September 28: United Taxi at 4:31, 4:40, and 4:50 a.m.; Caribe Taxi at 4:48 a.m.; and to Flash Taxi at 4:29, 5:30, 5:31, and 5:34 a.m. That number was also used to call defendant's girlfriend at 6:54 a.m. and defendant's cousin K.M. at 5:13 and 6:31 a.m.

In his videotaped statement to police, K.M. stated he had seen defendant and Parrish together with some other people on Prescott Place in Plainfield at 1:30 a.m. on September 28, and that he had called defendant at around 5:30 a.m. that morning, and that defendant said he was with Parrish on Third Street.

Parrish testified at defendant's trial as follows. On the night of September 27 and into the pre-dawn hours of September 28, he was hanging out with several people, including defendant,

4

drinking and smoking on the corner of Prescott Place and Third Street in Plainfield. Once the other people went home for the night, Parrish and defendant went to the Sixth Street area and set about "[f]inding people to rob," but the streets were empty so they "decided to do cabs," by which he meant "[r]ob them."

Parrish testified they decided he would perform the first robbery, and defendant gave him a silver revolver. Parrish called several taxi companies and requested to be picked up near the corner of Sixth Street and Lee Place, where defendant's girlfriend lived. Parrish and defendant waited in a dark area near the corner for a taxi to arrive. When a cab pulled up to the corner, Parrish approached the driver's side and began to get in. However, he saw that the divider between the front and back of the cab was closed, and realized he would not be able to rob the driver. He backed out, and the cab pulled away. Parrish believed that the driver sped off because he saw the revolver tucked into his jeans on his right hip.

Parrish testified he and defendant decided to try to rob another cab. This time, defendant called several cab companies from his phone and requested to be picked up on Spooner Avenue. When a cab arrived, defendant was in possession of the revolver and wearing gloves. Defendant and Parrish entered the backseat and got into "a little dispute going back and forth" about "who

was going to do [the robbery]." Defendant tried to get Parrish to take the gun, saying "go ahead, go ahead. I got the next one." Parrish refused, and told defendant "[i]f you ain't going to do it, I'm getting out." Parrish got out of the cab, and stood by a tree while waiting for defendant. Parrish heard defendant command the driver: "Give me the money. Give me the money." Parrish then heard a single gunshot go off inside the cab and saw a flash of light. Parrish saw defendant exit the cab and they fled in different directions.

The grand jury indicted defendant and Parrish with: count one - first-degree purposeful or knowing murder, N.J.S.A. 2C:11-3(a)(1) or (2); count two - first-degree armed robbery, N.J.S.A. 2C:15-1; count three - first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); count four - second-degree conspiracy to commit robbery, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:15-1; count five - second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and count six - second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1).

Parrish was tried separately and acquitted of murder, but convicted of the remaining charges. Prior to being sentenced, Parrish entered into an agreement with the prosecutor to testify against defendant in exchange for a recommendation that Parrish

be sentenced to thirty years in prison with a thirty-year period of parole ineligibility.[3]

Defendant's trial was conducted from March 3 to 18, 2015. The jury found defendant guilty of second-degree robbery on count two and first-degree felony murder under count three, and acquitted him on the remaining charges. The jury specifically found that: defendant committed robbery by threatening or putting in fear of immediate bodily injury, not by inflicting bodily injury or using force; defendant was not armed and did not use or threaten use of a deadly weapon; and defendant was guilty of felony murder as a non-slayer participant, not as a slayer participant. Defendant was sentenced to forty-five years in prison with a thirty-year period of parole ineligibility and an 85% period of parole ineligibility under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

Defendant appeals, arguing in his counseled brief:

> POINT I — DEFENDANT WAS DEPRIVED OF A FAIR TRIAL BY THE COURT'S FAILURE TO CHARGE, SUA SPONTE, THE STATUTORY AFFIRMATIVE DEFENSE TO NON-SLAYER PARTICIPANT FELONY MURDER. (Not Raised Below).

> POINT II — THE MATTER SHOULD BE REMANDED FOR RE-SENTENCING TO ACHIEVE GREATER UNIFORMITY IN THE SENTENCES IMPOSED ON MORGAN AND HIS CO-DEFENDANT (Not Raised Below), AND TO CORRECT ERRORS IN THE SENTENCING COURT'S FINDINGS.

---

[3] We affirm Parrish's judgment of conviction in a separate opinion.

A-0390-15T4

A.   This matter should be remanded to correct the disparity between Morgan's sentence and that of his more-culpable co-defendant.

B.   The matter should be remanded for re-sentencing to correct errors in the sentencing court's findings.

Also, defendant's pro se supplemental brief argues:

POINT I — Prosecutor Erred in charging Defendant Jonathan Morgan For Non-Slayer Participant To Murder. For there was no evidence to link Mr. Morgan to the offenses charged other than Co-Defendant.

POINT II — The Prosecution made Inflammatory and Bias[ed] remarks as well as Prejudicial Comments towards Defendant Jonathan Morgan that ultimately lead to the conviction of Defendants Trial.

II.

The trial court instructed the jury it could convict defendant of felony murder as a slayer participant or as a non-slayer participant. See Model Jury Charge (Criminal), "Felony Murder — Slayer Participant (N.J.S.A. 2C:11-3a(3))" (rev. Mar. 22, 2004); Model Jury Charge (Criminal), "Felony Murder — Non-Slayer Participant (N.J.S.A. 2C:11-3a(3))" (rev. Mar. 22, 2004) [Non-Slayer Charge]. Defendant never requested that the court charge on affirmative defense in the Non-Slayer Charge. During the charge conference, the trial court reviewed the Non-Slayer Charge and stated that the "[a]ffirmative defenses are not applicable here,"

and that the charge's language about the affirmative defense "comes out." Defense counsel did not object, even though he commented on other portions of the charge.

On appeal, defendant argues for the first time that the trial court should have sua sponte instructed the jury to consider the affirmative defense to non-slayer participant felony murder. However, the evidence did not require the court to instruct on that defense.

Where a defendant "does not request the [non-slayer affirmative defense] instruction, it is only when the evidence clearly indicates the appropriateness of such a charge that the court should give it." State v. Walker, 203 N.J. 73, 87 (2010). Moreover, such a defendant must show plain error. Id. at 78, 89. Defendant must demonstrate "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." Id. at 90 (quoting State v. Burns, 192 N.J. 312, 341 (2007)); see R. 2:10-2. We must hew to that standard of review.

Generally, "trial counsel's failure to request an instruction gives rise to a presumption that he did not view its absence as prejudicial to his client's case." State v. McGraw, 129 N.J. 68,

80 (1992). A claim of prejudice "'must be evaluated in light of the totality of the circumstances — including all the instructions to the jury, [as well as] the arguments of counsel.'" State v. Adams, 194 N.J. 186, 207 (2008) (citation omitted). An "error in a jury instruction that is 'crucial to the jury's deliberations on the guilt of a criminal defendant' is a '"poor candidate[] for rehabilitation" under the plain error theory.' Nevertheless, any alleged error also must be evaluated in light 'of the overall strength of the State's case.'" Burns, 192 N.J. at 341 (citations omitted); accord Walker, 203 N.J. at 90.

N.J.S.A. 2C:11-3(a)(3) includes an affirmative defense to a homicidal act if the defendant was not the only participant in the underlying crime and the defendant:

> (a) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and
>
> (b) Was not armed with a deadly weapon, or any instrument, article or substance readily capable of causing death or serious physical injury and of a sort not ordinarily carried in public places by law-abiding persons; and
>
> (c) Had no reasonable ground to believe that any other participant was armed with such a weapon, instrument, article or substance; and
>
> (d) Had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

A-0390-15T4

There must be "some evidence to support each of the four factors" before an instruction on the affirmative defense must be given. Walker, 203 N.J. at 84, 89. If the evidence "did not provide any support for" any one of the factors, the defendant was "not entitled to any instruction on the defense." State v. Smith, 322 N.J. Super. 385, 396 (App. Div. 1999); see State v. Ingram, 196 N.J. 23, 35, 43 (2008) (approving a judge's instruction that the State need only "disprove one of those elements"); Non-Slayer Charge at 5 (similar).

In Walker, our Supreme Court addressed for the first time "the issue of when a trial court should instruct the jury on the defense to statutory felony murder in the absence of a request to charge from counsel." Walker, 203 N.J. at 86. The Court held that the applicable standard is the standard governing "a trial court's duty to charge the jury sua sponte with lesser-included offenses." Id. at 86-87. As such, the Court instructed that "so long as there is some evidence pertaining to each of the four prongs of the defense, whether produced in the State's case or in defendant's case, the instruction on the affirmative defense to felony murder should be given to the jury." Id. at 89 (emphasis added).

Here, the record was devoid of evidence as to any of the four prongs. The only witness to the robbery and killing who testified

A-0390-15T4

was Parrish. Parrish testified defendant was armed with a deadly weapon and committed the homicidal act, negating two prerequisites for the affirmative defense. N.J.S.A. 2C:11-3(a)(3)(a)-(b).[4] There was no evidence to the contrary. Defendant did not testify or call any witnesses, and no statements by defendant were introduced at trial. Cf. Walker, 203 N.J. at 87-89 (relying on the defendant's trial testimony); Smith, 322 N.J. Super. at 396 (same). Because there was no evidence "that defendant was not a direct participant in the commission of the homicidal act" and was unarmed, the affirmative defense was inapplicable. State v. Sheika, 337 N.J. Super. 228, 251 (App. Div. 2001).

Indeed, defendant never claimed he was an unarmed participant in the robbery who did not commit the homicidal act. Rather, in his opening argument, defense counsel contended that defendant "had absolutely nothing to do with [the] two robberies of taxicab drivers on that morning," that "[t]here will be nothing connecting Mr. Morgan to this case other than" Parrish, that Parrish was the

---

[4] Parrish also testified defendant knew that Parrish had been armed with a deadly weapon, and that Parrish (like defendant) intended to commit armed robbery. We need not reach whether that was contrary to the other two prerequisites for the affirmative defense, N.J.S.A. 2C:11-3(a)(3)(c)-(d). See State v. Belliard, 415 N.J. Super. 51, 76 (App. Div. 2010) (indicating that a defendant must have "had nothing to do with the act that caused the death" and that "the intent and preset plan [must be] to commit a non-violent felony").

perpetrator, and that Parrish was lying to get a deal. In his closing arguments, defense counsel again contended that Parrish was "the sole actor" who "acted alone" and did the crimes "on his own," that Parrish was falsely implicating defendant to get a deal, and that there was no other testimony that defendant "was anywhere near either robbery." Defense counsel also argued that Parrish had borrowed defendant's cell phone to call the taxi companies, and that defendant was only "guilty of being in the [neighbor]hood." The jury did not agree.

Thus, there was no evidence supporting any of the prongs of N.J.S.A. 2C:11-3(a)(3)(a) — (d), nor did defendant claim there was any. Therefore, the trial court did not err in finding the affirmative defense was inapplicable.

Defendant argues that if the jurors believed only the State's evidence defendant used his cell phone to call taxi companies so a taxi could be robbed, they could have convicted him as an accomplice to robbery without finding he committed the homicidal act, was armed with a deadly weapon, or had a reasonable belief Parrish was armed with a deadly weapon. However, there was evidence supporting all of those findings, and no evidence to the contrary. There must be "some evidence" contrary to those findings, and indeed to all four factors in N.J.S.A. 2C:11-

13

3(a)(3)(a)-(d), before it is appropriate to instruct on the affirmative defense. Walker, 203 N.J. at 84, 89.

Moreover, to determine "when a trial court should instruct the jury on the defense to statutory felony murder in the absence of a request to charge from counsel," we apply "the standard that we require concerning a trial court's duty to charge the jury sua sponte with lesser-included offenses." Id. at 86. "[W]hen the defendant fails to ask for a charge on lesser-included offenses, the court is not obliged to sift meticulously through the record in search of any combination of facts supporting a lesser-included charge." Id. at 86-87 (quoting State v. Denofa, 187 N.J. 24, 42 (2006)). "Only if the record clearly indicates a lesser-included charge — that is, if the evidence is jumping off the page — must the court give the required instruction." Denofa, 187 N.J. at 42; see Walker, 203 N.J. at 86. Defendant's current parsing of the evidence would not have jumped off the page, was not clearly indicated, and improperly would have required the trial court to sift meticulously through the record in search of that particular combination of facts. It was not plain error that the trial court did not do so.

A-0390-15T4

Defendant notes he was acquitted of the handgun possession charges and of conspiracy to rob Gomez.[5] However, those acquittals after the trial was over did not supply the evidence absent when the trial court was shaping its charge. In any event, defendant cannot rely on acquittals because "it cannot be determined why a jury returned an acquittal." State v. Kelly, 201 N.J. 471, 488 (2010). Unlike guilty verdicts which must be supported by sufficient evidence, acquittals "may result from lenity, compromise, or even mistake. We therefore must resist the temptation to speculate on how the jury arrived at a verdict." State v. Goodwin, 224 N.J. 102, 116 (2016) (citations omitted).

Finally, we note the affirmative defense would have been "'incompatible with defendant's position at trial.'" State v. Daniels, 224 N.J. 168, 184 (2016) (quoting State v. R.T., 205 N.J. 493, 510 (2011) (Long, J., concurring)).[6] Defendant's defense was that he was totally uninvolved and unaware of Parrish's plans to commit robbery. However, the premise of the affirmative defense to felony murder is that the defendant was a "participant in the

_____

[5] We note the jury was not instructed it could find defendant guilty of the handgun charges as an accomplice or a conspirator, or guilty of conspiracy to rob if he conspired to rob Leonardo.

[6] In R.T., "four justices, or a majority of the Court, agreed with the analysis set forth in Justice Long's concurrence." Daniels, 224 N.J. at 184.

underlying crime," namely the robbery. N.J.S.A. 2C:11-3(a)(3); see Walker, 203 N.J. at 83. Such "affirmative defenses generally are more problematic because they have, 'at their core, the notion that a defendant has indeed committed the interdicted act but that he should be excused from its consequences.'" Daniels, 224 N.J. at 184 (quoting R.T., 205 N.J. at 510-11 (Long, J., concurring)).

Even if the affirmative defense "was clearly indicated on the record," courts must consider "whether the potential instruction would be incompatible with defendant's position at trial or would prejudice the defense in some way," such as by "dr[awing] the jury's attention away from his true defense — that he never intended to conspire or aid or assist in the commission of the crimes." Id. at 187. "[A] defendant who denies having committed a crime should not be required to acknowledge, either explicitly or inferentially, complicity in the event by way of a compelled affirmative defense." R.T., 205 N.J. at 511 (Long, J., concurring). "'[F]orcing counsel to incorporate defenses that pre-suppose the existence of the very fact his main method of defense contests destroys the credibility and coherence of the defense entirely.'" Id. at 510 (citation omitted). The trial court was not required sua sponte to "foist[] on defendant an affirmative defense that he did not want and could not meet." Daniels, 224 N.J. at 187.

III.

In his pro se brief, defendant argues the State could not charge him with felony murder either as the slayer or as a non-slayer participant. He claims that the only evidence against him was Parrish's testimony, that Parrish perjured himself, and that the prosecutor failed to disclose the perjury. However, while the verdict shows the jury did not find defendant guilty beyond a reasonable doubt of some of the counts despite Parrish's testimony, defendant has not shown that Parrish perjured himself, that the prosecution "knowingly used perjured testimony," or that there was "'any reasonable likelihood that the false testimony could have affected the judgment of the jury'" on the remaining counts. State v. Carter, 91 N.J. 86, 112 (1982) (quoting United States v. Agurs, 427 U.S. 97, 103-04 (1976)). Defendant's claim lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

IV.

Defendant's pro se brief argues he was unfairly prejudiced by remarks by the prosecutor. However, the trial court prevented any prejudice from the remarks.

Defendant cites a rhetorical question from the prosecutor's opening: "What innocent reason would there be to call three different cab companies in succession from two different phones and block your numbers?" Defendant did not object to that

statement. Accordingly, "defendant must demonstrate plain error." State v. Timmendequas, 161 N.J. 515, 576 (1999). "Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." Ibid. Indeed, it was "'fair to infer from the failure to object below that in the context of the trial the error was actually of no moment.'" State v. Nelson, 173 N.J. 417, 471 (2002) (quoting State v. Macon, 57 N.J. 325, 333 (1971)).

In closing, the prosecutor argued: "What innocent explanation? I submit there is none." The trial court interrupted, telling the jury:

> I want to remind the jury that the defendant doesn't have to explain a darn thing, not anything. . . . [Y]ou can't take into the jury room anything that would put any burden on the defendant that he has to produce any evidence or he has to prove his innocence or anything else. He doesn't have to explain anything.

In denying defendant's motion for a new trial, the trial court noted that "[t]he same principle was expressed to the jury on a great number of occasions during the initial instructions, . . . during voir dire, . . . and again during final instructions." For example, the court's final instructions reminded the jury:

> The burden of proving each and every element beyond a reasonable doubt rests on the State, and you know that burden never shifts over to the defense. It's not the defendant's duty or obligation to prove his innocence, as I said during summations, or even offer any

> proof relating to his innocence, which I said
> as well.

These instructions were more than adequate to remove any prejudice from the prosecutor's remarks, which in any event "were not a direct comment on defendant's failure to testify."  State v. Purnell, 126 N.J. 518, 539 (1992).

Defendant cites another remark from the prosecutor's opening: "The 5:35 call, what I refer to — and I will during the course of this trial — as the murder call, that came from a phone that was used by [defendant]."  Defendant again did not object, but after the prosecutor's opening, the trial court called both counsel to sidebar and instructed the prosecutor not to use the expression "murder call" because it was inflammatory.

During closing argument, the prosecutor referenced the "murder call" twice, and defense counsel objected to the second remark.  After a sidebar conference, the trial court stated it did not believe it justified a mistrial, but issued a prompt curative instruction:

> [T]he term "murder call" <u>should not influence
> your decision</u> one way or another.  As [the
> prosecutor] was instructed, she will no longer
> use that term for the phone call that was made
> to United Taxi.  Please don't let that inflame
> your senses.  I know murder is the charge.  I
> know the telephone call was alleged to have
> been made that led to the murder, but that's
> a shorthand term that shouldn't be used and <u>I</u>
> <u>don't want that to enter into your</u>

> deliberations to stir up your passions. This call has to be made by you without any passion, without any sympathy, without any preconceived ideas. I don't want any of those emotions entering into your deliberations at any time for any purpose so please don't consider that term as well.
>
> [(emphasis added).]

This instruction negated any potential prejudice arising from the prosecutor's use of "murder call." "We presume the jury followed the court's instructions." State v. Smith, 212 N.J. 365, 409 (2012). As the trial court found in denying defendant's motion for a new trial, it was "obvious the wording used by the assistant prosecutor did not impact the jur[ors] since they found defendant not guilty of murder and felony murder as a slayer participant." See State v. Patterson, 435 N.J. Super. 498, 511 (App. Div. 2014). Because "the trial court promptly and effectively dealt with those comments via a curative instruction . . . the relief requested by defendant is unwarranted." State v. Wakefield, 190 N.J. 397, 440 (2007).

Finally, defendant cites the prosecutor's comment in closing argument that Leonardo's "blood and . . . his brain ended up on the front seat of his taxicab." Defendant did not object, but the trial court raised the comment sua sponte in the same sidebar, and then instructed the jury:

you can consider the fact that there may be blood on there, but do not consider the fact that the material on that front seat was brain matter. . . . [T]hat's not competent evidence for you to consider so I'm not going to allow you to consider that. I'm going to strike that. Pretend you never heard it, never used it.

Moreover, the trial court instructed the jury before closing argument that "what's said during summations is not evidence." After the closings, the court reiterated:

Regardless of what counsel may have recounted the facts to be during the course of the trial or especially in summations, . . . it's your recollection of the evidence that should guide you in your deliberations. Arguments and statements and remarks and openings and closings while they're important are not evidence . . . [A]ny comments by counsel are not controlling.

In denying defendant's motion for a mistrial after summations, the trial court found it had given "enough curative instructions." In denying the motion for a new trial at sentencing, the court noted "[t]he record won't reflect my tone of voice but I was adamant when I gave those instructions." The court found the "immediate curative instruction[s] combined with the general instructions . . . removed any prejudice that may have resulted from those statements. The jury's verdict is proof that there was no manifest denial of justice under the law, nor was there any miscarriage of justice."

"Whether testimony or a comment by counsel is prejudicial and whether a prejudicial remark can be neutralized through a curative instruction or undermines the fairness of a trial are matters 'peculiarly within the competence of the trial judge.'" State v. Yough, 208 N.J. 385, 397 (2011) (citation omitted). "'An appellate court will not disturb a trial court's ruling on a motion for a mistrial, absent an abuse of discretion that results in a manifest injustice.'" State v. Jackson, 211 N.J. 394, 407 (2012) (citation omitted). We find no abuse of discretion.

V.

Finally, defendant's counseled brief challenges his sentence. "Appellate courts review sentencing determinations in accordance with a deferential standard." State v. Fuentes, 217 N.J. 57, 70 (2014). The sentence must be affirmed unless:

> (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) 'the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience.'
>
> [Ibid. (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

A.

Defendant argues this matter should be remanded for re-sentencing to correct the disparity between his forty-five year

sentence and Parrish's thirty-year sentence on the first-degree felony murder count. We disagree. However, the difference reflects that Parrish cooperated with the State.

Our Supreme Court has "consistently stressed uniformity as one of the major sentencing goals in the administration of criminal justice." State v. Roach, 146 N.J. 208, 231 (1996). Unwarranted "[d]isparity [with the sentence of a co-defendant] may invalidate an otherwise sound and lawful sentence." Id., at 232 (citing, e.g., State v. Hubbard, 176 N.J. Super. 174, 175 (Resent. Panel 1980)). However, "'[a] sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter.'" Ibid. (quoting State v. Hicks, 54 N.J. 390, 391 (1969)). "The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria." Id. at 233.

Defendant and Parrish are "dissimilar" because Parrish "provided meaningful cooperation with the prosecution," and "testified against defendant as a prosecution witness." State v. Williams, 317 N.J. Super. 149, 155, 159 (App. Div. 1998). "The leniency [Parrish] received was predicated upon [his] willingness . . . to cooperate with the State in the prosecution of [defendant]." Hubbard, 176 N.J. Super. at 186. "It would be grossly unfair" if a cooperating defendant "had to be sentenced

without regard to . . . [his] aid to the prosecution in coping with crime." Williams, 317 N.J. Super. at 159. Thus, "[t]here was no 'grievous inequity' between his sentence, and the sentence of the codefendant[] who w[as] eligible to receive mitigating consideration by reason of [his] cooperation with law enforcement authorities." State v. Gonzalez, 223 N.J. Super. 377, 393 (App. Div. 1988) (quoting Hicks, 54 N.J. at 391).

"[T]he Guidelines recognize the importance of a defendant's cooperation with the State which was clearly expressed by the Legislature when it made cooperation a mitigating factor for sentencing purposes." State v. Gerns, 145 N.J. 216, 224 (1996) (citing N.J.S.A. 2C:44-1(b)(12) (making "[t]he willingness of the defendant to cooperate with law enforcement authorities" a mitigating factor)). A sentencing court may and should acknowledge a defendant's cooperation. State v. Dalziel, 182 N.J. 494, 505-06 (2005).

Moreover, Roach focused on the unjustified disparity between defendants' minimum sentences and found "the disparity between the sentences is not minimal — it is huge: thirty additional years in prison." 146 N.J. at 216, 233. By contrast, defendant's minimum sentence under NERA was only 8.25 years longer than Parrish's thirty-year minimum sentence. Such a reward for cooperation was not "'such a clear error of judgment that it shocks the judicial

conscience.'" <u>Roach</u>, 146 N.J. at 230 (quoting <u>Roth</u>, 95 N.J. at 363-64).

Defendant emphasizes he was convicted of fewer crimes than Parrish. However, both defendants were convicted of first-degree felony murder. It was that crime which determined their maximum and minimum sentences.

We recognize defendant was convicted as a non-slayer participant, and Parrish as a slayer participant, in the felony murder. However, the "justification for the felony-murder rule" is that "one who commits a felony should be liable for a resulting, albeit unintended, death." <u>State v. Martin</u>, 119 N.J. 2, 20 (1990). None of the felons, including the slayer, need have any intent to kill. <u>Id.</u> at 20, 23. Unless the affirmative defense applies, the non-slayer equally "assume[d] a homicidal risk" by committing the felony. <u>Id.</u> at 22-23. Thus, an "accomplice may be liable for the death of the victim even if he or she was not the gunman who killed the victim, but was merely a lookout for the driver of a getaway car." <u>Id.</u> at 33. Given the nature of felony murder, we cannot say the difference in defendants' roles made the trial court's reward for cooperation unwarranted or shocking. <u>See</u> <u>ibid.</u> (stating "the focus should be on the relationship between the victim's death and the felony, not the individual roles of the various perpetrators").

A-0390-15T4

Finally, defendant was sentenced two months before Parrish, at which time Parrish had only a recommendation from the State for a thirty-year sentence. Accordingly, it was not yet certain what Parrish's sentence would be.

B.

Defendant further argues the trial court erred in finding aggravating factors. The sentencing court found no mitigating factors and aggravating factors three, six, and nine: "(3) The risk that the defendant will commit another offense"; "(6) The extent of the defendant's prior criminal record and the seriousness of the offenses of which he has been convicted"; and "(9) The need for deterring the defendant and others from violating the law." N.J.S.A. 2C:44-1(a).

Defendant claims his criminal record did not justify the trial court's finding that "[t]here is a strong aggravating factor six." However, the court properly relied on defendant's five prior indictable convictions for drug trafficking, drug possession, drug trafficking again, contempt, and his throwing bodily fluids at a Department of Corrections employee; two disorderly persons offenses for hindering; and two violations of probation as an adult as well as four juvenile adjudication for drugs, obstruction, and violating probation. Moreover, "the weighing of aggravating and mitigating factors" is left to the

26

"sound discretion" of the trial court.  State v. Jarbath, 114 N.J. 394, 402 (1989).  We find no abuse of discretion.

Defendant claims the trial court double-counted Leonardo's death in its finding of aggravating factor nine:

> There is definitely a need to deter here, both generally and specifically.  This was a senseless murder of a gentlemen who was trying to make a living for his family. He was living his life, and he was doing all the right things.  There is no reason these two gentlemen, as convicted by this jury, had the right to take his livelihood, to take him from his family, to take his life.

"It is well-settled that where the death of any individual is an element of the offense, that fact cannot be used as an aggravating factor for sentencing purposes."  State v. Carey, 168 N.J. 413, 425 (2001).  However, the court was emphasizing that defendant had "no reason" for this "senseless" killing.  A court may consider the senseless nature of a crime without double-counting.  See State v. Bowens, 108 N.J. 622, 639 (1987) (citing the "senseless nature of the stabbing").  Unlike a killing committed for a reason, which may not recur if the reason does not recur, a senseless killing may recur without reason, and thus may require greater deterrence.  Deterrence is "one of the most important factors in sentencing."  Fuentes, 217 N.J. at 78-79.  Thus, the court sufficiently explained why it found there was a need to deter both defendant and others, and its finding was

supported by competent and credible evidence in the record.  See id. at 80-81.  We find no "abuse of discretion."  State v. Robinson, 217 N.J. 594, 603 (2014).[7]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7] Cf. State v. Case, 220 N.J. 49, 68 (2014) (remanding where "the court did not adequately explain its decision to give that factor 'particular emphasis'"); Fuentes, 217 N.J. at 63 (remanding for further explanation where the judge found a contrary mitigating factor).

A-0390-15T4