**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2203-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

FERDINAND C. AUGELLO,

    Defendant-Appellant.

_____

Submitted January 5, 2021 – Decided April 20, 2021

Before Judges Gilson, Moynihan, and Gummer.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 18-04-0517.

Kelly Anderson Smith, attorney for appellant.

Damon G. Tyner, Atlantic County Prosecutor, attorney for respondent (John J. Santoliquido, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury found defendant Ferdinand C. Augello guilty of first-degree racketeering (RICO[1]), N.J.S.A. 2C:41-2(c), and conspiracy to racketeer, N.J.S.A. 2C:41-2(d) (count one); first-degree leader of a drug trafficking network, N.J.S.A. 2C:35-3 (count two); third-degree distribution of a controlled dangerous substance, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-5(b) (count three); first-degree conspiracy to distribute a controlled dangerous substance, N.J.S.A. 2C:35-5(a) and N.J.S.A. 2C:35-5(b) (count four); first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count five); and first-degree attempted murder, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:11-3(a)(1) (count nine), in connection with: the murder of April Kauffman (April),[2] the wife of Dr. James Kauffman (Kauffman); an OxyContin distribution network operated through Kauffman's medical practice; and a plot to murder Kauffman. Defendant appeals from the judgment of conviction, arguing:

---

[1] The source of New Jersey's racketeering laws, N.J.S.A. 2C:41-1 to -6.2, is the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961 to 1968, commonly known as the RICO Act or RICO. State v. Ball [Ball II], 141 N.J. 142, 156 (1995); see also State v. Taccetta, 301 N.J. Super. 227, 245 (App. Div. 1997). As such, the New Jersey laws are often also collectively referred to as the RICO Act, as was the case during the pretrial and trial proceedings in the Law Division.

[2] We use some given names in this opinion for clarity. We mean no disrespect or familiarity by our practice.

POINT I

THE TRIAL COURT FAILED TO SUPPRESS IMPROPER, HIGHLY PREJUDICIAL 404(B) EVIDENCE[.]

POINT II

THE STATE IRREPARABLY PREJUDICED JURORS AGAINST THE DEFENDANT BY [ITS] INFLAMMATORY COMMENTARY AND IMPROPER REFERENCES[.]

    A.    The State Relied upon Inappropriate Comments and Inferences Throughout [Its] Entire Opening Remarks[.]

    B.    The Summation Was Replete with Misconduct[.]

POINT III

THE TRIAL COURT'S INSUFFICIENT AND IMPROPER INSTRUCTIONS AND JURY CHARGES DENIED DEFENDANT A FAIR AND IMPARTIAL TRIAL[.]

    A.    Defendant was Prejudiced and Suffered Irreparable Harm When the Trial Court Failed to Provide the Jury with Timely and Sufficient Limiting Instructions Regarding Bad Acts Testimony.

    B.    The Jury Charges Were Insufficient and Incomplete.

POINT IV

THE TRIAL COURT IMPROPERLY ADMITTED HEARSAY STATEMENTS[.]

    A.    It Was Improper to Admit All Co-Conspirator Statements[.]

    B.    The Trial Court Committed Error in Admitting Hearsay Statements of the Victim[.]

    C.    The "Jacobs Letter" Was Improperly Admitted to the Jury[.]

POINT V

THE TRIAL COURT ERRED IN FAILING TO COMPEL FULL DISCOVERY OF STATE'S MATERIAL WITNESS[.]

POINT VI

THE TRIAL COURT ERRED BY PERMITTING THE STATE TO INCLUDE AN AMENDED CHARGE OF VICARIOUS ACCOMPLICE LIABILITY AFTER THE TESTIMONY WAS COMPLETE AND CROSS-EXAMINATION HAD FINALIZED[.]

POINT VII

THE STATE'S EXPERT WAS IMPROPERLY PERMITTED TO TESTIFY WITHOUT AN EXPERT REPORT[.]

POINT VIII

THE CUMULATIVE ERRORS COMMITTED BY
THE TRIAL COURT DENIED DEFENDANT A FAIR
TRIAL AND RESULTED IN A MANIFEST
INJUSTICE[.]

Unpersuaded, we affirm.

I

The trial evidence revealed Kauffman used his medical practice to illicitly distribute OxyContin to defendant, who was a retired member of the Cape May chapter of the Pagan Motorcycle Club (Pagans), and to defendant's associates, namely, the cooperating witness, Andrew Glick, and co-defendants Beverly Augello (defendant's ex-wife), Joseph Mulholland, Glenn Seeler, Tabitha Chapman, and Sheryl Pizza. All six associates testified at trial about their participation in the drug distribution ring and defendant's role in it.

Beginning in 2011, defendant referred individuals to Kauffman who, in exchange for $100, wrote prescriptions for 120 OxyContin pills. The individuals then gave defendant either cash or half of the prescription—sixty pills—which he would sell. In Chapman's case, defendant would accept massages rather than cash because she had no money. Each member of the distribution ring would typically see Kauffman in his office once per month, but sometimes Kauffman would write an individual two prescriptions, dated thirty

days apart, in exchange for $200. Defendant never personally saw Kauffman in his medical office, but occasionally he would have his associates deliver notes on his behalf to Kauffman.

In addition to that testimony, the State also presented evidence of pharmacy transactions related to the distribution of regulated narcotics.

The trial testimony of April's daughter Kimberly Pack, sister-in-law Julia Loftus, and best friend Lee Darby revealed the Kauffmans had a tumultuous marriage, and April had long expressed a desire for a divorce. Because Kauffman resisted that wish, April threatened to drive Kauffman into debt by spending exorbitant amounts of money and to expose the illegal drug distribution ring.

In the fall of 2011, defendant proposed to Mulholland that he kill April. Mulholland testified defendant told him Kauffman had wanted April killed because she was spending about $100,000 per month "and she knew . . . what he was doing and she was going to blow the drug ring up." Mulholland declined defendant's offer to kill April for $10,000 of the $30,000 Kauffman was willing to pay defendant.

Defendant also solicited Glick and Seeler, as well as Joseph Drinhouser—a member of the Pagans who was not involved in the distribution ring—to kill

6

April; all declined. In addition to defendant, Kauffman also asked Mulholland directly if he would be willing to kill his wife for $100,000. Mulholland testified that he had declined that offer as well.

According to Mulholland's testimony, defendant ultimately recruited Francis Mulholland (Frank)—no relation to Mulholland—to murder April. Mulholland introduced Frank, a heroin addict, to defendant after Frank had said he wanted to be part of the distribution ring. Mulholland testified that the plan was for Kauffman to leave his front door open after he left for work in the morning, allowing Frank entry to the house where he would shoot April, who they surmised would still be asleep in her room. Phone records during this time showed an increase in communications between defendant and Kauffman.

At defendant's direction, during the early morning hours on May 10, 2012, Mulholland drove Frank to the Kauffmans' home, dropped Frank off on the side of the road and drove to a diner in Somers Point. Frank later met Mulholland at the diner where Frank showed him a small handgun and reported that "he did the job." Frank said he had fired two shots at April who screamed. Mulholland called defendant and reported April was dead. Mulholland then drove to Frank's home; when Frank got out of the car, he gave Mulholland $1,000 and took the handgun with him. Frank told Mulholland defendant had paid him $10,000 for

the murder. Frank subsequently told Mulholland he had disposed of the handgun.

Defendant's ex-wife, Beverly, testified that on the morning of April's murder, defendant was at their sign business when she arrived at 7:30 a.m. Not long after her arrival, defendant told her to make an appointment with Kauffman because he had an envelope for defendant. Beverly saw Kauffman at 9:00 a.m., and he gave her prescriptions for her allergies and for 120 OxyContin pills. As she left the office, she picked up a sealed "white business-sized envelope" that she guessed, was about a quarter-inch thick and had "Fred" written on it. She gave the envelope to defendant at the sign shop. He put it inside a drawer and locked it.

Glick testified the drug distribution ring had continued to operate after April's murder, but defendant had discontinued recruiting new individuals to participate because the doctor started restricting who could get pills. Kauffman also increased the price of his prescriptions from $100 to $500.

Seventeen months after April's murder, Frank died of an apparent heroin overdose at his home. Mulholland testified he was there when Frank's body was discovered. Mulholland said when he told defendant about Frank's death, defendant "just smirked." Mulholland also testified that defendant was fearful

Frank was an addict who would have cooperated with law enforcement if he were arrested.

Several years later, on June 13, 2017, while April's murder remained unsolved, Kauffman was arrested on unrelated charges for prescription fraud and weapons offenses. When Glick went to Kauffman's office to retrieve his medical records, he was told his records were among those seized by the Atlantic County Prosecutor's Office (ACPO). Glick went to the ACPO after arranging with Detective James Scoppa to pick up his records. Scoppa questioned him about his relationship with Kauffman and the prescriptions Kauffman wrote for him—particularly a prescription that was written on the day after April's murder. Glick told the detective he had not seen the doctor that day, rather that prescription was one Kauffman had written the month before but post-dated to May. Glick told Scoppa he knew nothing about the murder and wanted to speak to an attorney before answering any more questions. Later in the meeting, Scoppa told Glick that he was aware that Glick was selling illegal substances, particularly methamphetamine. Glick admitted to it but denied selling prescription pain medication.

Glick was arrested for drug distribution on November 1, 2017. He agreed to cooperate with the ACPO in the investigation of April's murder by recording

9

his conversations with defendant and others. To prompt discussion with defendant about the murder, Scoppa gave Glick a letter (the Jacobs Letter) authored by Kauffman's attorney, Edwin Jacobs, Jr., which was sent to the ACPO in March 2017 and connected defendant and Frank to the murder.

Glick testified, and the recordings played at trial showed, that during his conversations with defendant, defendant would turn on the radio and write notes to Glick to communicate information that he did not want to say aloud. Defendant was heard to say on one of the recordings that he was "convinced that [his] phone [was] tapped" and thus was careful with his words. When Glick informed defendant of the Jacobs Letter, defendant made clear that he wanted a copy of the letter. He also wrote a note saying, "the doc would be dead in two days."

Later recordings also revealed that defendant had sought to have Kauffman murdered. During the conversations, defendant often called Kauffman "a rat." He also acknowledged having had a meeting with Kauffman at which Kauffman said defendant's name out loud causing defendant to worry he was being recorded. And they discussed selling Kauffman's car; defendant worried that would connect him to April's murder.

The recordings also revealed conversations with defendant and others pertaining to the drug distribution ring and April's murder. Defendant acknowledged he had made his associates money as a result of the drug distribution ring: "I mean I made us money[.]"

Kauffman committed suicide in jail while awaiting trial.

## II

We review defendant's varied evidential arguments, recognizing "the decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010); see also State v. Scott, 229 N.J. 469, 479 (2017). We "apply a deferential standard in reviewing a trial [judge's] evidentiary rulings and uphold its determinations 'absent . . . an abuse of discretion.'" Scott, 229 N.J. at 479 (quoting State v. Perry, 225 N.J. 222, 233 (2016)). An abuse of discretion may be shown if there is a "clear error in judgment" or a ruling that would result in "a manifest denial of justice." Ibid. (quoting Perry, 225 N.J. at 233).

## A

Defendant first challenges the admission of evidence about the "customs, rules, and belief systems" of the Cape May chapter of the Pagans—of which he was past president—claiming it was not direct evidence but prior-bad-act

11

evidence, N.J.R.E. 404(b), that should have been analyzed under the Cofield test.[3]  Defendant argues that evidence "unfairly made [defendant] out to be a menace due to Pagan association[,] not because of his own actions"; and the trial judge erred by "failing to properly limit the witness' testimony of unnecessary and irrelevant details that destroyed . . . [d]efendant's image and bolstered his propensity for violence," precluding his right to "a fair and unbiased trial."

The trial judge granted the State's pretrial motion to admit evidence regarding the Pagans as "admissible to establish the elements of the RICO charge and the underlying conspiracies."  The judge did not abuse his discretion because the evidence was relevant to the elements of the indictment's RICO count alleging defendant, Chapman, Pizza, Seeler, Beverly, and Mulholland, as well as Kauffman and other unnamed persons, were "coconspirators and

---

[3] Under State v. Cofield, 127 N.J. 328, 338 (1992), the party proffering evidence of a prior bad act must prove:
> 1. The evidence of the other crime must be admissible as relevant to a material issue;
> 2. It must be similar in kind and reasonably close in time to the offense charged;
> 3. The evidence of the other crime must be clear and convincing; and
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.

12

members or associates of [a] criminal enterprise," who committed racketeering. Accordingly, the evidence was not subject to analysis under N.J.R.E. 404(b).

Before fully addressing that issue, we first reject defendant's contention that the trial judge made a blanket preliminary ruling to admit all Pagan-related evidence, subject only to the judge's prohibition against describing the Pagans as a gang or an "outlaw" motorcycle club. After the assistant prosecutor responded to the judge's call for a "need to know" how evidence about the Pagans' customs, beliefs and operations was "going to come in if it[] [was] coming in[,]" by naming the witnesses who would testify, defendant's counsel did not contest the admission of that evidence, noting the defense was "on notice, certainly, of the Pagans aspect of this, and [that] the court [would] rule as it [saw] fit on this." Counsel noted only her prior concern that she did not have "a proffer on what the lay witnesses [were going] to say and the basis of their knowledge." The judge specifically recognized his in limine ruling was "subject to any further rulings that the court may make with respect to notice and availability of witnesses and any [prior] statements they may have made," and that he would "hear, of course, any timely objections during trial with respect to the evidence as it comes in."

Returning to the link between the Pagan-related evidence and the indicted crimes, RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in or activities of which affect trade or commerce to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Ball II, 141 N.J. at 171-72 (quoting N.J.S.A. 2C:41-2(c)). Thus, in a RICO prosecution, the State is required to prove:

> (1) the existence of an enterprise; (2) that the enterprise engaged in or its activities affected trade or commerce; (3) that defendant was employed by, or associated with the enterprise; (4) that he or she participated in the conduct of the affairs of the enterprise; and (5) that he or she participated through a pattern of racketeering activity.
>
> [State v. Ball [Ball I], 268 N.J. Super. 72, 99 (App. Div. 1993), aff'd, 141 N.J. 142 (1995).]

To that end, the State must present evidence of the discrete elements of an "enterprise" and "a pattern of racketeering activity." Ball II, 141 N.J. at 161-62.

"The enterprise is the association, and the pattern of racketeering activity consists of the predicate incidents. Nevertheless, evidence that serves to establish such an enterprise need not be distinct or different from the proof that establishes the pattern of racketeering activity." Id. at 162.

The enterprise must have an "organization," consisting of "those kinds of interactions that become necessary when a group, to accomplish its goal, divides among its members the tasks that are necessary to achieve a common purpose." Ibid. Evidence of a structure within the enterprise "support[s] the inference that the group engaged in carefully planned and highly coordinated criminal activity." Ibid. Besides the structure, the evidence must focus on the number of persons involved, their knowledge of the organization's objectives, the manner in which they interacted, their individual roles, the level of planning, the decision-making process, the coordinated implementation of decisions, the frequency of racketeering activity, and the amount of time between each incident. Id. at 162-63.

A pattern of racketeering activity has two components: (1) at least two incidents of racketeering conduct (predicate acts); and (2) the conduct must have "the same or similar purposes, results, participants or victims or methods of commission or are otherwise interrelated by distinguishing characteristics and are not isolated incidents." N.J.S.A. 2C:41-1(d). "[T]he primary criterion of New Jersey's 'pattern of racketeering activity' is 'relatedness,'" which "calls for the application of a broad standard involving the totality of all relevant circumstances" that "may include 'continuity.'" Ball II, 141 N.J. at 169.

In the indictment, the State alleged the enterprise consisted of the named defendants, Kauffman and other "associates or members named but not charged," including members of the Pagans. Drinhouser, who defendant had solicited to kill April, identified defendant as the president of the Pagans at the time he joined in 2010. Defendant also solicited Seeler, a Pagan, to kill April. He asked Glick, who had succeeded defendant as president of the Cape May chapter, if he would ascertain if there was anybody who would be interested in killing April.

So too, there was testimony from numerous witnesses about defendant's role in the drug distribution scheme. Seeler testified he, as well as Mulholland, Pizza, Beverly, and Glick—all of whom were members of or associated with the Pagans[4]—had illegally obtained drugs from Kauffman of which defendant received a share. Defendant solicited Glick to expand the scheme. Seeler delivered notes between defendant and Kauffman, as did Glick. And Glick, Beverly, Mulholland, Seeler, and Pizza testified about their participation in the drug distribution ring and defendant's role.

---

[4] Glick testified Mulholland was a member of the Herd or Shore Dogs, a then Pagans "support group."

Glick further testified about his concern that April's murder would be tied to the Pagans, and that the "mother club" would find out it had not been receiving its share of "tribute" from the drug distribution operation. Glick also told the jury that a ranking member of the "mother club" and two "pretty big guys" came to him because the ranking member was "hearing this stuff that . . . the Pagans down here, either Atlantic or Cape May or somebody, [was] involved in [April's] murder." Glick said he had lied when he told the "mother club" Pagans he knew nothing about it because if he had told the truth, he "probably would have got[ten his] ass handed to [him], beaten and [his] jacket taken," that is, he would have lost his membership.

Inasmuch as two of the predicate acts alleged in the indictment were April's murder and the distribution of drugs, as well as the conspiracy to commit those crimes, the State properly sought to prove the existence of the enterprise, as well as its organization and pattern of activities coordinated through defendant. That evidence was pertinent to the indicted charges, not to other crimes.

Because federal case law is often useful in perpending our RICO law, Ball II, 141 N.J. at 156, we find apposite the Second Circuit's opinion in United States v. Coppola, 671 F.3d 220, 244 (2d Cir. 2012), where the court addressed the

defendant's argument that he received an unfair trial because the government introduced inadmissible evidence of crimes committed by crime families that "did not specifically implicate" the defendant. The Second Circuit concluded:

> such evidence [was] relevant to prove both the enterprise and pattern elements of the charged racketeering crimes. . . . "[E]vidence of numerous criminal acts by a variety of persons" may be relevant to prove the enterprise and pattern elements of racketeering. Thus, even though a defendant "may reasonably claim no direct participation" in the acts of others, evidence of those acts may be relevant to prove (1) the "existence and nature" of the racketeering enterprise, and (2) a pattern of racketeering activity by the defendant "by providing the requisite relationship and continuity of illegal activities."
>
> [Id. at 244-45 (quoting United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992)).]

We agree with the court of appeals that "[s]uch conduct is not 'other' crime[s] evidence . . . ; rather, it is evidence of the very racketeering crimes charged." Id. at 245. Thus, even though the evidence relating to the racketeering charge included proof of criminal activities that did not always directly involve defendant, it was admissible as part of the State's efforts to prove the existence of an enterprise and a pattern of racketeering activity. Ibid.; see also Ball II, 141 N.J. at 175 (holding a defendant can be found to have participated in an enterprise even if his role "do[es] not exert control or direction over the affairs

18

of the enterprise, as long as the actor, directly or indirectly, knowingly seeks to carry out, assist, or further the operations of the enterprise or otherwise seeks to implement or execute managerial or supervisory decisions").

The trial judge properly admitted evidence of the criminal activity conducted by members of the Pagans—largely directed by defendant, even after he was "retired" from the club—as well as evidence of its customs, beliefs and operations. That evidence was relevant to proving the enterprise, a substantial part of which was comprised of Pagans and associates, and which, the evidence shows, was influenced by those customs, beliefs and operations.

It was also relevant to proving that the enterprise was engaged in a pattern of racketeering activity. N.J.S.A. 2C:41-2(c). As correctly recognized by the trial judge, it need not have been evaluated as other crimes evidence under N.J.R.E. 404(b). We discern no abuse of discretion in the judge's admission of the evidence relevant to the Pagans' existence, organization and pattern of activity. It not only proved those elements of racketeering; it showed the pervasive Pagan tenets that undergirded defendant's control over the enterprise and its members, and his expansion and protection of the drug distribution ring by force or threat, including murder and conspiracy to commit same.

19

The evidence involved details of the Pagans' activities that, despite the trial judge's admonition to refrain from referring to it as an "outlaw" club or by similar terms, showed the club was just that. When asked what the Pagans was, Drinhouser explained that it was "a one-percent motorcycle club," and "one-percent" "was a term that came up . . . years ago [when] someone had said [ninety-nine] percent of the people that ride motorcycles are law-abiding citizens and the other one[-]percent aren't." Likewise, Seeler said the term was derived from "one[-]percenters [who] take the law into their own hands[,]" as opposed to "[n]inety-nine percent of the population [who] follow[] the rules and regulations[.]" Glick also made the same reference, specifically referring to the Pagans as an "outlaw" group. So too, members used that term in their monikers.

We previously recognized that gang membership alone is not evidence of criminal activity, but "it is at the very least strongly suggestive of such activity."[5] State v. Goodman, 415 N.J. Super. 210, 227 (App. Div. 2010). Thus, where evidence of gang membership is presented, a limiting instruction is usually required "because the average juror would likely conclude that a gang member has engaged in criminal activity. Such evidence has the potential to 'taint' a

---

[5] The defendant in Goodman was not charged with racketeering.

defendant in much the same way as evidence of actual criminal conduct." Id. at 228.

The trial judge here was attuned to the potential prejudice engendered by the State's racketeering proofs and, inviting input from counsel, crafted a limiting instruction to ameliorate the prejudice and curtail the jury's consideration of that evidence. Defendant challenges the timing, sufficiency and completeness of the instruction.

The instruction, presented after opening statements and prior to the presentation of witness testimony, referenced the State's opening statement that the jury would hear: "evidence that . . . defendant was or is a member or leader in an organization referred to as the Pagans Motorcycle Club"; "alleged criminal activity of the Pagans and those associated with the Pagans"; "the history, hierarchy, membership and rules of the Pagans"; and the Pagans' involvement in "drug distribution, racketeering and murder in this case."

The judge instructed the jury it could utilize only what was presented as evidence; it could not consider any information about the Pagans learned from any other source. The judge also instructed the jury: "the limited purpose for the introduction of evidence related to the defendant's alleged affiliation with the Pagans and the organization and purposes of the Pagans [was] to show the

21

defendant's involvement with racketeering activity"; "defendant's association with the Pagans constituted his involvement in an enterprise and a pattern of racketeering activity"; and "the existence of an enterprise [comprised] of the defendant and others who are associated . . . with the purpose of carrying out at least two incidents of racketeering conduct alleged" including "leader of a narcotics trafficking network, distribution or possession with intent to distribute controlled dangerous substances, murder and the attempt or conspiracy to commit these crimes." Whether the evidence proved the existence of the elements of racketeering beyond a reasonable doubt was left exclusively to the jury. The judge cautioned that "defendant's mere association with or membership in the Pagans in itself in no way proves the defendant was involved in racketeering activity or that the Pagans constituted a criminal enterprise."

The judge also explained the jury had to determine whether "defendant's conduct, together with the conduct of others in association with the Pagans, constituted a pattern of racketeering activity[,]" and that "evidence of criminal activity by persons associated in the Pagans may be relevant to [the jury's] consideration whether the State has proven the existence of an enterprise and the pattern of elements of racketeering." The judge explicated that evidence of activities in which defendant had no direct participation might be relevant to the

jury's "consideration of whether the State has proven the existence and nature of the racketeering enterprise and the pattern of racketeering activity by . . . defendant by providing the requisite relationship in continuity of alleged illegal acts."

The judge repeated those principles and reminded the jury of that instruction before Glick's cross-examination resumed on the fourth day of his testimony. Throughout Glick's testimony, evidence, including Glick's recorded conversations, was introduced showing defendant's alleged involvement in what defendant contends were other-crime activities. Glick referred to defendant's activities as "Freddy crime world."

Defendant's counsel first objected after a portion of Glick's conversation with Drinhouser was played during his first day of testimony, claiming that unrelated crimes she described as "the job on the Parkway" and "the lumping up [of] the heating and cooling guy," were being attributed to defendant and should be considered under N.J.R.E. 404(b). The judge told defendant's counsel he would: reserve on defendant's objection, stop the recording if he perceived a need and "certainly hear [from defendant's counsel] outside the presence of the jury." Glick's lengthy testimony continued for the rest of that day without further objection. At the end of the day, defendant's counsel briefly said that

they were "going to talk about a potential curative [instruction] with 404(b) issues."

The next day, before Glick's testimony resumed, the judge reiterated that he would "consider certain limiting instructions or other remedies [that] may be suggested by the defense," and proposed the matter be addressed cumulatively, subject to any specific objection raised by defendant during Glick's continued testimony. Defendant's counsel responded she had "wrongly assumed that with [the] trial court order there would be some kind of motion made or there would be redactions ahead of time[,]" and that she was awaiting a digest so she could "make specific objections." She continued that "[i]f we're going to handle it with a curative instruction, and again my objection is it's cumulative, [she would] make notes in [her] transcripts"; she pointedly "ask[ed] that nothing, even if it's curative, [the assistant prosecutor] has suggested things be stricken, . . . [be] stricken from the record." The judge advised that he would continue to listen to the recordings for objectionable evidence, but determined that "at least so far what [he] heard[,] with proper instructions[,] could be taken as part of the overall corrupt enterprise" alleged by the State.

Two days later, before final cross-examination, the judge ruled that, contrary to defendant's position, the evidence adduced through Glick was related

to the State's racketeering charge and was not subject to analysis under N.J.R.E. 404(b). The judge read his proposed charge to counsel outside the jury's presence, referring to "certain terms and phrases" the jury had heard during Glick's testimony and recorded conversations "that reference[d] . . . defendant's alleged involvement with things like Freddy crime world, the Mafia and certain dealings among the Pagans and others." Before harkening to his prior charge about the limited use of that evidence, the judge told the jury the "evidence was permitted in connection with the State's charges against . . . defendant that his actions between 2011 and 2017 with the Pagans and others associated with him and with the Pagans constituted the pattern of illegal activity as charged in the indictment." Defendant's counsel said she had no objection to the instruction. When, in response to defendant's counsel's request that the charge be given immediately and at the end of her cross-examination, the judge said he would give the charge before Glick resumed the stand and in the final charge, defendant's counsel responded, "[t]hank you." The instruction was repeated without objection in the final charge.

Although defendant's failure to object at trial constitutes a waiver of his right to challenge the instruction on appeal, State v. Afanador, 151 N.J. 41, 54

(1997); R. 1:7-2, we review his challenge to the timing, sufficiency and completeness of the instruction under the plain error standard, R. 2:10-2.

> In considering a jury charge, plain error is "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result."
>
> [State v. Jordan, 147 N.J. 409, 422 (1997) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).]

We discern no error in the charge that prejudiced defendant. The instruction informed the jury as to the uses to which the evidence could and could not be put, limiting any prejudice. Glick was on the stand for five days, evidenced by approximately 952 pages of transcript. The evidence of criminal activities by the enterprise was vast. Not only would it be unrealistic to expect the judge to reference in the instruction each act defendant claims should have been specified, e.g., the racial epithets used during the lengthy conversations, it would have also encroached upon the jury's function to determine which evidence it would accept and what was relevant and material to the elements of the racketeering charge. Indeed, the jury could have determined some of the evidence defendant now claims was attributed to his activities did not clearly implicate defendant, such as the uncharged death of Frank who, evidence

showed, died from an overdose. If highlighted by the trial judge, the jury may have been swayed to impute that death to defendant.

For the same reasons, it would have been unreasonable for the judge to repeat the instruction every time defendant claimed Glick provided "inflammatory testimony." Though we recognize instructions are most effective if given contemporaneously with the admission of the pertinent evidence, see, e.g., State v. Fortin, 189 N.J. 579, 601 (2007) (finding that the limiting instruction regarding other-crime evidence should be given "both at the time the . . . evidence is presented and in the final jury charge"), the significance of any delay in giving such instructions depends on the circumstances of the particular case, see, e.g., State v. Baker, 400 N.J. Super. 28, 46-48 (App. Div. 2008), aff'd o.b., 198 N.J. 189 (2009) (finding that a one-week delay in giving a limiting charge on other crimes evidence was not reversible error where the sufficiency of the final charge was adequate); State v. Hummel, 132 N.J. Super. 412, 424 (App. Div. 1975) (holding that inclusion of the limiting charge in the court's instructions to the jury at the end of the case is sufficient). The interruptions that would have been caused if the judge had given the limiting instruction during Glick's long testimony would have been intrusive. Moreover, defendant's

counsel voiced limited objections to the evidence and deemed the instructions as given sufficient.

B

Defendant argues the trial judge erred by granting the State's pretrial motion to admit "all statements made [by coconspirators] in furtherance of the conspiracies" because he did not consider the specific statements the State planned to introduce. The judge did not make a blanket ruling. He merely recognized that under N.J.R.E. 803(b)(5)—the coconspirator exception to the hearsay rule—coconspirators' statements were generally admissible, but noted "general admissibility does not necessarily allow the State to bring [in] all such evidence in . . . the event that an objection is made or in the event that the testimony does not come in the way it is anticipated." Thus, the judge directed that "at the time of the testimony," if either party "hear[s] or see[s] something is different than what they anticipated," they should then "ask either for a sidebar or adjournment so [they] can discuss the matter with the court and then we'll see where that may go."

Defendant never lodged such an objection or requested a sidebar related to that issue. And he does not now specify the coconspirators—many of whom testified—whose hearsay was admitted, or what was said in those statements; he

28

generally refers to "[p]artial hearsay statements." His present claims that the admission of recorded statements was error because they were "not in furtherance to a conspiracy, but rather in response to an investigation" that took place years after, and that the statements were inadmissible because the State presented "[n]o physical or direct evidence," independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it, are bald arguments. We cannot properly analyze an argument that is not developed in a party's merits brief. Chase Bank USA, N.A. v. Staffenberg, 419 N.J. Super. 386, 413 n.17 (App. Div. 2011).

To qualify for admission under the coconspirator exception: "(1) the statement must have been made in furtherance of the conspiracy; (2) the statement must have been made during the course of the conspiracy; and (3) there must be 'evidence, independent of the hearsay, of the existence of the conspiracy and defendant's relationship to it.'" State v. Savage, 172 N.J. 374, 402 (2002) (quoting State v. Phelps, 96 N.J. 500, 509-10 (1984)).

Although a statement may be admissible against a party if it is "made at the time the party-opponent and the declarant were participating in a plan to commit a crime or civil wrong and the statement was made in furtherance of that plan," N.J.R.E. 803(b)(5), any scheme to avoid apprehension and prosecution

continues a conspiracy beyond the actual commission of its objective, State v. Soto, 340 N.J. Super. 47, 65 (App. Div. 2001) (holding a statement made to evade capture after a crime was completed furthered the conspiracy), overruled on other grounds, State v. Dalziel, 182 N.J. 494 (2005); State v. Cherry, 289 N.J. Super. 503, 523 (App. Div. 1995) (holding statements by coconspirator to establish a plan to prevent detection of himself and, in turn, the defendant furthered the conspiracy).

> Moreover, statements relating to past events may be admissible if they are "in furtherance" of the conspiracy and "serve some current purpose, such as to provide cohesiveness, provide reassurances to a [coconspirator], or prompt one not a member of the conspiracy to respond in a way that furthers the goals of the conspiracy."
>
> [Savage, 172 N.J. at 403 (quoting Taccetta, 301 N.J. Super. at 253).]

We do not discern any abuse of discretion in the trial judge's ruling that

> there appears to be sufficient evidence of the conspiracy and . . . defendant's relationship to it independent of the hearsay; for example, the records of pharmacy transactions related to the distribution of [drugs] are independent of the coconspirator hearsay. Further, there is evidence in connection with the overarching drug ring so-called and . . . defendant's involvement in it giving rise to independent and corroborative evidence related to the homicide of April . . . and evidence of . . . defendant's own admitted

> contact and involvement in the alleged plan to kill . . .
> Kauffman related to that conspiracy charge.

The recorded statements were proof of defendant's involvement in the drug distribution ring, April's murder and defendant's plan to murder Kauffman. They evidenced defendant's desire to cover-up past events and avoid detection by law enforcement. Moreover, contrary to defendant's argument, there was evidence—independent of the wiretap statements—of the conspiracies and defendant's relationship to them. Glick, Beverly, Mulholland, Seeler, Chapman, and Pizza testified about their participation in the drug distribution ring and defendant's role in it. Glick, Mulholland, Seeler, and Drinhouser testified about how defendant solicited them to murder April; Mulholland further testified about how he was involved in the murder and how he was directed by defendant to carry out the crime. Glick and Scoppa testified about defendant's plan to murder Kauffman. As the judge noted, there was also evidence of pharmacy transactions related to the distribution of drugs, and phone records which showed an increase in communications between defendant and Kauffman in the days leading up to April's murder. On this record, we see no error, let alone plain error, in the court's decision to admit the wiretap statements, or more generally, the coconspirator statements, especially where defendant posed no objection to any specific statement. See Afanador, 151 N.J. at 54.

31

## C

Defendant maintains the trial judge erred by granting the State's pretrial motion to admit April's statements to show defendant's motive, which the judge described as "derivative of . . . Kauffman's alleged motive to kill his wife to prevent a costly divorce or to preclude the inopportune disclosure of personal and potentially criminal information."

The judge heard testimony from Pack and Scoppa during a pretrial hearing. Pack testified: Kauffman told her April wanted a divorce; she heard April tell Kauffman that she hated him after accusing him of filling prescriptions in her name for antipsychotic medication; April told her, in a conversation that was overheard by Kauffman, she was unhappy, hated Kauffman and wanted a divorce. Pack also testified that a "famous quote" of Kauffman was that he was going to kill April before she took half of his empire.

Scoppa testified that, in statements he took from Glick, Drinhouser and Mulholland, they said Kauffman wanted to kill April because "she was going to divorce him and take half of his money, . . . she was cheating on him, and . . . Kauffman was scared that she was going to out him and his illegal activities that he was doing with the Pagan guys." On cross-examination he verified that Glick "gave [him] information supposedly about [defendant's] motivation or . . .

32

Kauffman's motivation and [Glick] got . . . Kauffman's motivation supposedly from [defendant] and then that went to . . . Glick." Scoppa also testified Drinhouser said defendant had pointed out Kauffman's house and then had told Drinhouser he had a job for him because Kauffman wanted his wife killed and would pay him $10,000 in cash.

From that proffer the judge concluded "defendant's motive, if any, in the murder of April . . . [was] derivative of . . . Kauffman's alleged motive to kill his wife to prevent a costly divorce or to preclude the inopportune disclosure of personal and potentially criminal information." From Pack's testimony the judge concluded Kauffman had known April wanted a divorce and had said he would kill her before she took "half of his empire." The judge recognized our Supreme Court's observation that "[i]t takes no great leap of intuition to understand that divorce could motivate a person to kill[,]" State v. Calleia, 206 N.J. 274, 301 (2011), in finding April's wish for a divorce and Kauffman's reaction had evidenced his motive to kill April. The judge then credited Scoppa's testimony and found his interviews with Glick, Drinhouser and Mulholland had revealed they had been "in possession of information or knowledge of interactions with . . . defendant and his knowledge of . . . Kauffman's desires to carry out a homicide against April." The judge concluded the State had established the

admissibility of April's hearsay under N.J.R.E. 803(c)(3). We note that prior to the judge's ruling, defendant's counsel told the judge, in light of Scoppa's proffer, she could "see how the ruling [would] come down and [she would] make arguments regarding weight before the jury."

N.J.R.E. 803(c)(3) allows admission of "[a] statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed[.]" In Calleia, the Court considered the admissibility of evidence, under N.J.R.E. 803(c)(3), from the deceased victim's friends "who uniformly revealed that [the victim] was unhappy with her marriage, was contemplating divorce, and described steps she had taken in furtherance of obtaining a divorce from defendant" to prove motive. 206 N.J. at 284-85.

The Calleia Court announced a revised view of such evidence, recognizing "the special role of motive evidence and its unique capacity to provide a jury with an overarching narrative, permitting inferences for why a defendant might have engaged in the alleged criminal conduct." Id. at 293. Because "motive must [often] be pieced together; potential motivating factors must be gleaned from evidence that does not itself bespeak criminal intent but merely explains

34                                                                    A-2203-18

what events might have led the accused to commit a criminal act," "motive is treated somewhat differently than other types of evidence," and "a 'wider range of evidence' is permitted to prove motive, so long as it remains a material issue in a case." Id. at 293-94 (quoting State v. Covell, 157 N.J. 554, 565 (1999)). "'Any evidence which has a legitimate bearing on the question of motive is as a general rule admissible' so long as it 'at least to a slight degree tend[s] to establish the existence of the motive relied on.'" Id. at 293 (alteration in original) (quoting 41 C.J.S. Homicide § 325 (2006)). "Time and again, courts have admitted motive evidence even when it did no more than raise an inference of why a defendant may have engaged in criminal conduct, and even in the face of a certain degree of potential prejudice stemming from the evidence." Id. at 294. When evidence provides proof of motive, "a strong showing of prejudice is necessary to exclude" such evidence under the balancing test of N.J.R.E. 403. Ibid.

The Court, nevertheless, emphasized

> a fact can only be probative on the question of motive if a defendant is aware of that fact. Thus, in order to be admissible as motive evidence, the State must directly or circumstantially show that the accused probably knew of the facts that are alleged to have given rise to the motive.
>
> [Id. at 296.]

The Court repeated that admonition three times, concluding: "There can be no misunderstanding: a prosecutor must demonstrate that a defendant knew or likely knew of a victim's conduct in order for the victim's conduct to provide motive evidence." Id. at 297.

The State's proffer demonstrated Kauffman's motive to have April killed. Pack's testimony about Kauffman's "famous quote" about killing April to prevent her from taking his assets, and Scoppa's proffer that Glick, Drinhouser and Mulholland said Kauffman wanted to kill April because "she was going to divorce him and take half of his money, . . . she was cheating on him, and . . . Kauffman was scared that she was going to out him and his illegal activities that he was doing with the Pagan guys[,]" was sufficient evidence to permit April's hearsay statements under N.J.R.E. 803(c)(3) if offered against Kauffman.

Defendant presently argues the State failed to establish defendant had known of Kauffman's motive. Although the trial judge should have relied upon more compelling evidence than that offered by Scoppa's account of his interviews with Glick, Drinhouser and Mulholland, Glick, himself, testified defendant had told him, in Mulholland's presence, that Kauffman "was looking for someone to kill his wife because she was . . . going to divorce him, was cheating on him, and he wasn't going to give her half of his wealth which was

almost five million." In the fall of 2011, defendant proposed to Mulholland that he kill April. Mulholland testified defendant had told him Kauffman wanted April killed because she was spending about $100,000 per month "and she knew . . . what he was doing and she was going to blow the drug ring up." Considering that evidence of defendant's knowledge of Kauffman's motives, the judge did not abuse his discretion by admitting April's statements. Although defendant's knowledge of all of Kauffman's motives was not shown by the evidence, defendant does not contend he was painted with a brush any broader than that relating to the motives of which he had knowledge.

We determine defendant's argument that April's statements should have been analyzed for admissibility under N.J.R.E. 803(b)(5) instead of N.J.R.E. 803(c)(3) to be without sufficient merit to warrant discussion. R. 2:11-3(e)(2). April was not a coconspirator.

D

In his last evidential argument, defendant argues the trial judge abused his discretion by granting the State's pretrial motion to admit hearsay: the Jacobs Letter. During a pretrial hearing, the judge heard testimony from Jacobs who said he had authored the March 20, 2017 letter, and from Scoppa who said he

had provided the letter to Glick on November 11, 2017[6] because Scoppa believed if Glick presented the letter to defendant, it "would strike up conversation" about April's murder. According to the judge's instruction to the jury, the Jacobs Letter was written in response to an October 4, 2012 inquiry from the ACPO asking if Kauffman "knew of any person who would have wanted to harm April," who was killed on May 10, 2012.[7] Jacobs responded that the names of Frank and defendant had been brought to his attention.

The judge ruled the letter could be considered as evidence of defendant's motive to conspire to murder Kauffman, subject to a jury instruction limiting the use of that evidence to that purpose. The State presented a recorded conversation between Glick and defendant, during which Glick showed defendant the letter. Defendant responded by saying: "Here's what I think. When I saw that paper . . . [w]ith my name on it . . . [t]hat guy is giving me up . . . as the suspect to a murder"; and that "this guy"—who the State contended was Kauffman—could tell the authorities that he paid defendant to arrange

---

[6] During the Rule 104 hearing Scoppa also testified he had given the letter to Glick on November 13, 2018, but during cross-examination stated the year was 2017. We note Glick agreed to cooperate in 2017, and the trial commenced in Fall 2018.

[7] Neither the Jacobs Letter nor the October 4, 2012 letter of inquiry was provided in defendant's appendix; the State did not submit an appendix.

April's murder. Defendant continued that the person to whom Beverly passed notes—which evidence shows was Kauffman—would "fucking rat in a minute" and disclose "every detail" including notes from defendant to Kauffman. Defendant told Glick: "He's already given my name to the fucking Prosecutor's [O]ffice as a suspect in a murder." The State argued that the recorded conversation showed defendant wanted Kauffman dead.

The judge cautioned the jury the letter was "not proof that [defendant] committed the offenses charged against him or that . . . Kauffman or any other person identified him in connection with the death of April[.]" The judge instructed that the only purpose for which the letter "and the testimony of the several witnesses concerning th[e] exhibit" could be considered was to prove defendant's motive, leaving to them the decision if it did.

The letter was not, as defendant now contends, hearsay. As the judge explained, it was not offered for proof of what was stated therein. See N.J.R.E. 801(c)(2). "[I]f evidence is not offered for the truth of the matter asserted, the evidence is not hearsay and no exception to the hearsay rule is necessary to introduce that evidence at trial." State v. Long, 173 N.J. 138, 152 (2002). Moreover, in light of the evidence supporting the letter's relevance to the State's contention that it prompted defendant's statement to Glick that Kauffman should

be killed to prevent him from implicating defendant, the judge did not abuse his discretion in admitting it. Indeed, Mulholland testified defendant had shown him the Jacobs Letter while pointing a gun at him, had told Mulholland that the letter was from Mulholland's one-time lawyer's firm; and had said he was being set up and was afraid Kauffman would cooperate with law enforcement authorities.

III

Defendant argues he "was compromised and denied due process" when the State failed to provide its experts' reports, and the court failed to exclude the experts' testimony "despite the requirements of the Court Rules and [d]efendant's clear application to bar the[ir] testimony."

Defendant's counsel protested pretrial about the "problem" she had because she did not "know the names" of a computer-crimes detective and a forensic detective who the State was going to call and she had "not been provided any expert reports in that regard" although their titles "appear[ed] to refer to expert witness testimony." After counsel made an application to bar experts whose reports she had not received, the trial judge instructed counsel to confer, exchange any additional information, if needed, and to contact him in

writing if they could not resolve the issue on their own. The record does not show this issue came before the court again.

The State called two expert witnesses during trial: Federal Bureau of Investigation Special Agent John Hauger, an expert in historical cell-site analysis and Doctor Gary Collins, a medical examiner, who was called to testify about the autopsy that was performed on April's body.[8]

Prior to Hauger's testimony, defendant's counsel raised an objection, not to the State's failure to supply his report, but to "information being incorporated into the expert report." Contrary to defendant's present argument, defendant's counsel was obviously in possession of Hauger's report and voiced no objection that she could not proceed because it had not been provided or not timely provided.

Nor did defendant raise any objection because the defense was not provided with an expert report before the doctor testified to the straightforward cause of death: a gunshot wound to April's chest that caused "heavy internal

---

[8] Ian Finnimore, a forensic crime-scene detective, testified as a fact witness, though defendant's counsel elicited that he had previously given expert opinions. The State did not present the testimony of a computer-crimes expert.

bleeding" or "hemorrhagic shock[.]" In summation, defendant's counsel told the jury April "died from gunshot wounds inflicted on her body in her own home."

There is no merit to defendant's argument.

IV

Defendant argues the trial judge erred by denying his pretrial request for discovery pertaining to Glick's arrest on unrelated drug charges and his agreement to cooperate with the State.

Although the assistant prosecutor represented there was no formal or informal agreement between the ACPO and Glick other than "the plea which is [a] public record," the judge ordered the State to provide defendant with an explanation of payments made to Glick by the ACPO and FBI and any documentation related thereto. The judge ruled "Glick's cooperation and involvement . . . has to be made known," and told defendant's counsel she could "examine any witness on agreements, if any[.]"

As to defendant's petition for discovery linked to Glick's unrelated arrest, reportedly made after a search warrant was executed, the judge denied that request because Glick's

> criminal exposure is still a matter of State's
> investigation and does not need to be made known.
> Confidential informants that are involved that you don't
> plan on calling as witnesses in this case don't need to

be made known. On the theory that Mr. Glick may spit the bit and may decide not to cooperate and then you go back to start, so the court is not in a position to jeopardize the State's investigation in an unrelated criminal activity alleged against Mr. Glick.

The judge clarified, in response to defendant's counsel's inquiry, that he was "not requiring the State to produce [discovery in Glick's unrelated case] absent information about his cooperation in this case." The judge did, however, tell defendant's counsel she could "ask [Glick] whatever you want to ask him when he's on the stand." Counsel did cross-examine Glick about his arrest on separate drug charges; his expectations about the outcome on those charges; the existence of any cooperation agreements; payments to him by the ACPO and FBI; his cooperation and its impact on his separate charges, including their administrative dismissal; uncharged acts; and on the crimes charged in this matter.

"We accord substantial deference to a trial court's issuance of a discovery order and will not interfere with such an order absent an abuse of discretion." State v. Hernandez, 225 N.J. 451, 461 (2016); see also State ex rel. A.B., 219 N.J. 542, 554 (2014). Accordingly, we "defer to a trial court's resolution of a discovery matter, provided its determination is not so wide of the mark or is not 'based on a mistaken understanding of the applicable law.'" A.B., 219 N.J. at

43

554 (quoting Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)).  We do not perceive that to be the case here.

The judge's decision heeded the tenets that defendants are entitled to discover a witness's plea and cooperation agreement and cross-examine a witness on his "expectation of favorable treatment for his cooperation and argue that he has sold his services and testimony to the State"; and to information concerning any violation of the cooperation agreements, including disclosure of material false statements made by the witness and known to the State. Hernandez, 225 N.J. at 464-65.  The judge also recognized the limits the Court placed on discovery of unrelated cases:

> Although our discovery rule generally requires that the State provide all evidence relevant to the defense of criminal charges, it does not open the door to foraging through files of other cases in search of relevant evidence.  The only information discoverable in the unrelated cases that is relevant to the defense at this point are the cooperation agreements between the State and the Witness and any violations of the agreements, such as material false statements made by the Witness and known to the State.  The discovery order here requires disclosure of information not mandated by our discovery rule—information that has no ostensible relevance to the case to be tried.
>
> [Id. at 453-54.]

In Hernandez, the State's case relied "on a cooperating witness who ha[d] given assistance to law enforcement in a number of criminal investigations." Id. at 464. The State provided the defendants with "the [w]itness's name, his statements to law enforcement authorities, his criminal history, his plea and cooperation agreements, audio recordings of the alleged drug transactions, the report of the forensic analysis of the cocaine allegedly sold by defendants, and investigative reports concerning the alleged offenses committed by defendants." Ibid. The defendants wanted what the Court described as "open-file discovery of unrelated cases because the present case and the unrelated cases share a common thread—the same cooperating witness." Ibid.

The Court observed that rewards offered by the government to a cooperating witness had the "capacity to induce false testimony[,]" necessitating the State's "complete disclosure of the [witness's] cooperation and plea agreements[,]" and "[t]hrough defendant['s] cross-examination and summation, the jury [would] know" the witness had reason to seek the State's favor. Id. at 468. So too, the Court required the State to disclose material false statements it knew the witness had made in the unrelated investigation. Ibid. But the Court ruled the defendants' discovery request in connection with the unrelated cases did not "fall within the ambit" of the criminal discovery rule reasoning unless

45

the defendants could "signify with some specificity the relevance of the requested documents—as opposed to speculative relevance"—discovery would not be ordered "at least until defendants can make some concrete showing of need." Ibid.

Through that lens, we determine the judge did not abuse his discretion by denying defendant's discovery request. The judge carefully considered and balanced the State's ongoing investigation in the unrelated matter, the informants' involvement and defendant's unstated need for discovery in that case.

V

Defendant urges us to reverse because the "State irreparably prejudiced jurors against [him] by [its] inflammatory commentary and improper inferences" in its opening and closing statements. Defendant did not object to any of the assistant prosecutor's remarks.

We reject defendant's contention that the trial judge prohibited objections from defendant's counsel to the State's opening and closing remarks. Defendant misstates the record. The judge merely stated his "usual rule and preference" was to have counsel "reserve any objections during . . . openings or closings." The judge explained any such refrainment was "without prejudice," and invited

counsel to bring to his attention "anything objectionable . . . at the end of the [the adversary's] statement[,]" and he would then take "any corrective action necessary[.]"

"Generally, if no objection was made to the improper remarks, [they] will not be deemed prejudicial. Failure to make a timely objection indicates that defense counsel did not believe the remarks were prejudicial" when made, and "also deprives the court of the opportunity to take curative action." State v. Timmendequas, 161 N.J. 515, 576 (1999). To justify a reversal and a new trial, "the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." Id. at 575 (quoting State v. Hightower, 120 N.J. 378, 411 (1990)); see also State v. Wakefield, 190 N.J. 397, 438 (2007); R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may . . . notice plain error not brought to [its] attention."). We are satisfied that none of the comments challenged on appeal constitutes plain error. R. 2:10-2.

Defendant argues it was improper for the assistant prosecutor to: suggest that Glick had taken a risk by assisting law enforcement; suggest that defendant

had connections to the Mafia or the Mexican Cartel; and "unduly impress the jury by touting the credentials of his office and the case" by saying that this case was the Atlantic County Prosecutor's "top priority." We disagree. These assertions permissibly "provide[d] an outline or roadmap of the State's case" and were "limited to a general recital of what the State expect[ed], in good faith, to prove by competent evidence." State v. Walden, 370 N.J. Super. 549, 558 (App. Div. 2004); see also State v. Land, 435 N.J. Super. 249, 269 (App. Div. 2014).

Glick testified he feared for his safety because he cooperated with law enforcement; so too, Mulholland testified that defendant had threatened to kill him if he ever implicated defendant in April's murder. Mulholland further testified that defendant had pointed a gun to his head when defendant confronted him with the Jacobs Letter and that "[defendant] didn't trust [him]" and "always threatened to kill" him.

Glick and Scoppa testified regarding defendant's connections to organized crime. Scoppa specifically recounted how he had followed defendant to the Borgata Casino where he had observed defendant having a meeting with members of the Mafia. Mulholland testified that defendant had "told [him] he had spoken to . . . Glick" and "that some cartel was going to take care of the

doctor," and that defendant had wanted Mulholland to call his "Mafia friends" to deal with Kauffman.

The assistant prosecutor's passing comment regarding the Prosecutor's prioritization of defendant's case related to a recorded conversation during which Glick explained to defendant there was renewed interest in April's death, five years after the letter that prompted the Jacobs Letter had been written, "because of the new prosecutor."

Nor do we see any merit in defendant's argument that it was improper for the prosecutor to infer defendant was responsible for Frank's death, highlighting as particularly egregious the prosecutor's repeated use of the phrase: "[t]hree people can keep a secret if two are dead." The remark referred to the State's theory that "in [defendant's] mind, there[] [were] only three people on earth that can get tied to that murder": Frank, Kauffman and defendant; and since Frank and Kauffman were dead, defendant may have thought his secret was safe. The assistant prosecutor later clarified the State's position: "Maybe three people can keep a secret if two are dead, but this defendant could not keep his mouth shut, and so it's not just three people. It's many, many more . . . people who you're going to hear from."

49

Trial evidence showed that defendant was worried Frank would expose him; and when Mulholland told him of Frank's death, he "just smirked." Contrary to defendant's skewed argument, the assistant prosecutor never suggested defendant was responsible for Frank's death. The overwhelming evidence was that Frank died from an overdose, as defendant's counsel noted in summation, "face down in his own vomit on the carpet in the living room of the . . . house his father had owned[.]" And it is undisputed Kauffman committed suicide in the jail.

The assistant prosecutor did violate the trial judge's order to refrain from referring to the Pagans as an "outlaw" motorcycle club when he said defendant "was the president of what is known as the Pagan Outlaw Motorcycle Club." There was ample evidence of illegal activities conducted by members of the Pagans. We note defendant's counsel twice referred to the club as "the Pagan [O]utlaw [M]otorcycle [C]lub" in summation. The trial judge's limiting instruction guided the jury's use of evidence of defendant's association with the Pagans. The jury is presumed to have followed that instruction. State v. Burns, 192 N.J. 312, 335 (2007). Improper remarks made by the prosecutor must be considered in the context of the opening as a whole and will not be grounds for reversal, particularly if unobjected to, as long as they did not deprive defendant

of a fair trial. State v. Roman, 382 N.J. Super. 44, 57-58, 61 (App. Div. 2005). The assistant prosecutor's single, fleeting comment does not warrant reversal.

Defendant's argument that, in his closing statement, the assistant prosecutor prejudiced defendant when he improperly "made [it] a point to denigrate the defense and cast suspicion onto the [d]efense [t]eam's integrity and motivation"; "call[ed] defendant a monster"; and told the jury "[j]ustice demand[s] he's guilty," is without sufficient merit to warrant discussion in this opinion, R. 2:11-3(e)(2), save for some brief explanation.

The summation, in context, while at times melodramatic, presented the State's case graphically and "forceful[ly]," State v. Bradshaw, 195 N.J. 493, 510 (2008), within the confines of the evidence. The assistant prosecutor's closing remarks responded to the defense summation during which counsel attempted to eviscerate the State's multiple witnesses' testimony relating to the establishment of the enterprise by calling Glick a "con man"; Seeler a "Nazi sympathizer"; Mulholland "a cold-hearted man who . . . sold drugs in concert with Glick" and had retained the law firm, whose partner—who she described as "a mob lawyer representing a snitch"—authored the Jacobs Letter, represent him in connection with separate crimes that resulted in "no conviction, apart from this while the whole scheme was playing out"; Pizza a woman "entirely under the control of

her husband . . . Seeler"; Chapman a woman "unable to remember anything of the time period without her memory being refreshed"; and Beverly a woman who "sold her pills to [defendant]." Throughout summation, the defense attacked the State's witnesses' credibility, interests and motives, and highlighted their illegal activities.

The assistant prosecutor did not denigrate the defense, only its theories. He did not cast ad hominem aspersions; he responded to the defense's attack on the State's witnesses. "It is not improper for the prosecution to suggest that the defense's presentation was imbalanced and incomplete." Timmendequas, 161 N.J. at 593; see also State v. Patterson, 435 N.J. Super. 498, 508 (App. Div. 2014). Nor did the assistant prosecutor call defendant "a monster." And considering the assistant prosecutor's complete statement: "Ladies and gentleman, I ask you to find this man guilty, but not because I say he's guilty, but because the evidence proves his guilt, because justice demand[s] he's guilty," not just the distorted portion argued by defendant, we perceive no impropriety.

The assistant prosecutor's opening and closing—that brought no objection from defendant—were not "so egregious as to deprive defendant of a fair trial." State v. Papasavvas, 163 N.J. 565, 615 (2000); see also Wakefield, 190 N.J. at 437. "Prosecutorial comments are deemed to have violated the defendant's right

to a fair trial when they 'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" State v. Jackson, 211 N.J. 394, 409 (2012) (alteration in original) (quoting State v. Koedatich, 112 N.J. 225, 338 (1988)). The trial record shows such was not the case.

VI

Defendant's argument that the trial judge erred by allowing "the State to include an amended charge of vicarious accomplice liability" "and changed the scope of the [r]acketeering charge" after the trial evidence had been presented is also meritless. Despite the State's request during the charge conference that the judge tailor that portion of the racketeering model jury charge instructing on the fifth element of N.J.S.A. 2C:41-2(c), as charged in the indictment's first count, the judge delivered the model charge largely verbatim. "When a jury instruction follows the model jury charge, although not determinative, 'it is persuasive argument in favor of the charge as delivered.'" State v. Whitaker, 402 N.J. Super. 495, 513-14 (App. Div. 2008) (quoting State v. Angoy, 329 N.J. Super. 79, 84 (App. Div. 2000)). The judge delineated the incidents of racketeering alleged by the State—those set forth in counts two through six of the indictment. The instruction did not veer from the original racketeering charge set forth in the indictment.

Conflating the racketeering count with the murder count, defendant argues "[t]he State further manipulated the charge." He argues the State, despite its contention that Frank killed April, requested during the charge conference that the jury be instructed that it alleged April's murder was committed by "another" instead of specifying Frank. The State reasoned the jury could find someone other than Frank committed the murder, but defendant would still be guilty of conspiracy to commit murder if he conspired with that other person.

Although the trial judge's final charge on conspiracy-vicarious liability and conspiracy to commit murder included that April's murder "was committed by Francis Mulholland or by others acting in the conspiracy to murder April Kauffman," he explained

> defendant is legally accountable as an accomplice acting in conspiracy with Francis Mulholland or with others [acting] in the conspiracy for the crime of murder committed by Francis Mulholland or with others in the conspiracy because the defendant and Francis Mulholland or the others in the conspiracy allegedly conspired together to commit the crime. Specifically, the State alleges that Francis Mulholland, Joseph Mulholland and James Kauffman conspired among themselves or with defendant to murder April Kauffman.

He continued: "The State alleges that defendant is legally responsible for the criminal conduct of Francis Mulholland" under the conspiracy statute.

54

The judge did not adopt the State's suggestion. Although the judge added "others" when he referenced Frank throughout the murder charge, the evidence showed those "others" also played a role in the conspiracy to commit April's murder. This was not an alternative theory to that originally charged in the indictment and advanced during the trial. As the trial judge observed, the proofs before the jury were that "Mulholland facilitated the delivery of [Frank] to the scene of the crime and that [Frank], based on some of the other testimony, was the guy who [shot April], and that . . . defendant's role, if these witnesses are to be believed, was the person who orchestrated it[.]" Kauffman, it was alleged, paid for the murder.

Neither the State nor defendant's counsel voiced any objection to the judge's final charge when the trial resumed four days after the charge conference, just prior to closing statements and the final instructions to the jury; counsel had received the final charge the day before. Nor did counsel object at the conclusion of the charge.

Absent objection, we review the instruction for plain error and only reverse if that error was "clearly capable of producing an unjust result." State v. McKinney, 223 N.J. 475, 494 (2015) (quoting R. 2:10-2). An unjust result arises when the error "raise[s] a reasonable doubt as to whether the error led the

jury to a result it otherwise might not have reached." State v. Macon, 57 N.J. 325, 336 (1971); see also State v. Taffaro, 195 N.J. 442, 454 (2008). Failure to object creates a "presum[ption] that the instructions were adequate." State v. Morais, 359 N.J. Super. 123, 134-35 (App. Div. 2003).

In our judgment the jury instruction laid a clear path for the jury, adequately explaining the applicable law.

## VII

To the extent not here addressed, we determine defendant's remaining arguments, including that "the cumulative errors committed by the trial [judge] denied . . . defendant of a fair trial and resulted in a manifest injustice," to be without sufficient merit to warrant any discussion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

56